## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AMERICREDIT FINANCIAL SERVICES, INC. d/b/a GM FINANCIAL, | : : : : |
| Plaintiff, | : : No. 5:25-CV-01945 (JMG) |
| v. | : : : |
| WHITMOYER CHEVROLET, INC., STEVEN BA. KAHLON, and KINLEY CO. VENTURES, INC. | : : : : |
| Defendants. | : : : |

## <u>ORDER</u>

AND NOW, this _____ day of _____, _____ upon consideration of Movant,

Univest Bank and Trust Co.'s Motion to Intervene and Memorandum of Law, it is hereby

ORDERED AND DECREED that:

Said Motion is GRANTED. Movant, Univest Bank and Trust Co. is permitted to intervene

as a party in the above-captioned action.

BY THE COURT:

_____

J.

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMERICREDIT FINANCIAL SERVICES, INC. d/b/a GM FINANCIAL, | : <br> : <br> : |
| Plaintiff, | : No. 5:25-CV-01945 (JMG) <br> : |
| v. | : <br> : <br> : |
| WHITMOYER CHEVROLET, INC., STEVEN BA. KAHLON, and KINLEY CO. VENTURES, INC. | : <br> : <br> : <br> : |
| Defendants. | : <br> : |

## MOTION TO INTERVENE

Movant, Univest Bank and Trust Co. ("Univest"), by its counsel, Stradley Ronon Stevens & Young LLP, does hereby move this Honorable Court pursuant to Federal Rule of Civil Procedure 24 for an order allowing it to intervene in the above-captioned lawsuit to protect its interests in the property of defendant, Whitmoyer Chevrolet, Inc., in which Univest has a senior security interest. In support hereof, Univest relies on the Affidavit of Peter Scirrotto and the accompanying Memorandum of Law, each of which are incorporated herein as if set forth in full.

Respectfully submitted,

*/s/ Julie M. Murphy*

Julie M. Murphy Esquire
STRADLEY RONON STEVENS & YOUNG LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Telephone: (856) 321-2409
Facsimile: (215)564-8120
Email: jmmurphy@stradley.com
*Counsel for Univest Bank and Trust Co.*

*/s/ Matts Batryn*

Matts Batryn, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AMERICREDIT FINANCIAL SERVICES, INC. d/b/a GM FINANCIAL, | : <br> : <br> : |
| Plaintiff, | :    No. 5:25-CV-01945 (JMG) <br> : <br> : |
| v. | : <br> : |
| WHITMOYER CHEVROLET, INC., STEVEN BA. KAHLON, and KINLEY CO. VENTURES, INC. | : <br> : <br> : <br> : |
| Defendants. | : <br> : |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO INTERVENE**

## I.    <u>FACTS</u>

Plaintiff, AmeriCredit Financial Services, Inc. d/b/a GM Financial ("GMF") commenced the above-captioned action, seeking a writ of seizure, an injunction and confession of judgment against the named defendants based on the alleged sale of vehicle collateral of GMF without payment to GMF.   <u>See</u>, <u>generally</u>, Complaint [Docket Entry No. 1].

Movant, Univest Bank and Trust Co. ("Univest") is a secured creditor of Defendant Whitmoyer Chevrolet, Inc. ("Whitmoyer") and, as of May 1, 2025, was owed no less than $8.3 million from Whitmoyer in connection with a revolving line of credit (the "Line of Credit").  <u>See</u>, Affidavit of Peter Scirrotto ("Scirrotto Aff."), at ¶¶ 2, 4.  The Line of Credit is secured by, among other things, a security interest in and lien on all of the assets of, among others, Whitmoyer.  <u>Id.</u>, at ¶¶ 2, 3. The Univest lien includes (but is not limited to) a lien on Whitmoyer's accounts receivable.  <u>Id.</u> at ¶ 2.   The Univest security interest in and lien on the assets of Whitmoyer was perfected by virtue of the recording of that certain UCC-1 Financing Statement filed on December

19, 2024, with the Pennsylvania Department of State at File No. 20241219284570 (the "UCC-1"). Id. at ¶ 3(b).

On or about November 20, 2024, Univest and GMF entered into an Intercreditor Agreement pursuant to which the parties agreed on the respective priority of the liens of Univest and GMF.  Id. at ¶ 5.  Section 1 of the Intercreditor Agreement provides that Univest has a first priority lien on and security interest in Whitmoyer's presently owned or thereafter acquired personal property consisting of the following (the "Univest Priority Collateral"):

> "(a) All vehicle receivables that have been identified as extended payment privilege vehicles between [Whitmoyer] and [GMF] and are financed by [Univest] and for which [GMF] has been paid in full for the foregoing vehicles; (b) All Proceeds of the foregoing."

Id.  Section 9 of the Intercreditor Agreement also contains the agreement of each of GMF and Univest not to directly or indirectly contest the perfection, validity or enforceability of each other's security interests.  Id.

The Complaint makes no reference to the Intercreditor Agreement and Univest was not notified of the commencement of the above-captioned litigation.  See, generally, Complaint. Instead, GMF claims a first priority continuing security interest in all of Whitmoyer's assets, without reference to Univest's superior interest in the Univest Priority Collateral.  See, Complaint ¶¶ 23, 24, 25.  On May 8, 2025, Univest received a Notification of Disposition of Collateral from GMF (the "Notice of Disposition").  See, Scirrotto Aff., ¶ 6.  The Notice of Disposition states GMF's intent to dispose of repossessed vehicles via private sale.  Id.  While Section 10 of the Intercreditor Agreement provides that each party use reasonable efforts to provide advance notice to each other prior to or concurrent with commencing any judicial or non-judicial action to enforce its respective security interest, Univest learned of the above-captioned action only on receipt of

the Notice of Disposition, approximately three (3) weeks after the commencement of the above-captioned action. See Scirrotto Aff., ¶¶ 5, 7, 8.

Univest does not contest the right of GMF to foreclose its security interest in the vehicles. Rather, Univest appears in this action to ensure that it is timely informed of any proposed course of action by GMF that would or could impair the rights of Univest with respect to Whitmoyer or the Univest Priority Collateral.

## II.    ARGUMENT AS TO INTERVENTION

### A.    Pursuant To Fed. R. Civ. P. 24(a), Univest May Intervene As of Right.

Intervention as of right is governed by Federal Rule of Civil Procedure 24(a), which provides, in relevant part:

> Upon timely application, the court must permit anyone to intervene who . . . (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).

To succeed on a motion to intervene as of right, all of the requirements of Fed. R. Civ. P. 24(a)(2) must be satisfied. See, e.g., Harris v. Pernsley, 820 F.2d 592, 596 (3d Cir. 1987). Under Rule 24(a)(2), a person is entitled to intervene if: (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter, by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation. Id., citing Commonwealth of Pennsylvania v. Rizzo, 530 F.2d 501, 504 (3d Cir.), cert. denied sub nom., Fire Fighters Union v. Pennsylvania, 426 U.S. 921 (1976).

When considering a motion to intervene, the court must accept the applicant's well pleaded allegations as true, making no determination as to the merits of the issues in dispute. *See* Oneida Indian Nation of Wisc. v. New York, 732 F.2d 261, 265 (2d Cir. 1984). Each factor of the rule is met here and this Court should grant the motion to intervene as of right.

### 1.    The Motion To Intervene Was Timely Filed.

The issue of timeliness is for the sound discretion of the trial court. NAACP v. New York, 413 U.S. 345, 365-66 (1973). In cases where the applicant seeks to intervene for the purpose of litigating the merits of the underlying litigation, the United States Court of Appeals for the Third Circuit has set forth three factors to consider in determining whether a motion to intervene is timely:

> (1)    how far the proceedings have gone when the movant seeks to intervene;
>
> (2)    prejudice which resultant delay might cause to other parties; and
>
> (3)    the reason for the delay.

Rizzo, 530 F.2d 501.

In this case, there is little doubt that the motion was timely filed. This case was commenced on April 15, 2025. While the Court has permitted repossession of the vehicle collateral, no other assets have been subject to disposition and the defendants have not yet responded to the merits of the claims set forth in the Complaint. Accordingly, this intervention motion will not delay the proceedings and thus will not result in any prejudice to any party.[1]

### 2.    Univest has a Legal Interest in Whitmoyer's Assets That the Complaint Ignores and Would be Overlooked but for Intervention.

---

[1]    Notably, Univest would suffer prejudice if the Court were to deny its motion because it would not have the opportunity to assert and protect its rights in a case where those rights have been ignored. *See* Dow Jones & Co., Inc. v. U.S. Dept. of Justice, 161 F.R.D. 247 (S.D.N.Y. 1995), *citing* United States v. New York, 820 F.2d 554, 557 (2d Cir. 1987) (prejudice to proposed intervenor is among the factors to be considered in determining timeliness under Fed. R. Civ. P. 24(a)(2)).

6214597v.1

Rule 24(a)(2) requires the proposed intervenor to assert a tangible threat to a cognizable legal interest, not simply an interest "'of a general and indefinite character.'" Harris, 820 F.2d at 601, *quoting* American Telephone & Telegraph Co., 642 F.2d at 1292. The applicant's interest must be one that is "significantly protectable," Donaldson v. United States, 400 U.S. 517 (1970), but given the nature of an applicant's interest, he or she may have a sufficient interest to intervene as to certain issues in an action without having an interest in the litigation as a whole. Harris, 820 F.2d at 598 (citations omitted).

Plaintiff's Complaint recites that GMF holds a first priority security interest in all of Whitmoyer's assets without recognizing Univest's bargained-for superior interest in the Univest Priority Collateral. Absent intervention Univest could be deprived of assets in which its interests are superior to Plaintiff's interests. While Plaintiff's initial recovery efforts target the vehicle collateral in which Univest does not claim a superior interest, Plaintiff also seeks relief that impair Univest's interests in and ability to realize on the Univest Priority Collateral. Thus, Univest has sufficient interest in this action to intervene as of right. Id. at 601; Donaldson, 400 U.S. 517.

Univest's right to exercise remedies against collateral and Plaintiff's failure to recognize Univest's rights are sufficient grounds to warrant intervention as of right.

**3.     The Interests of Univest Will Be Impaired If It Is Not Permitted to Intervene.**

As demonstrated, absent intervention, Univest's interests in the Univest Priority Collateral are likely to be circumvented and impaired. While Univest has commenced its own litigation against Whitmoyer on the breaches by Whitmoyer under the Line of Credit Documents, if Plaintiff is permitted to collect the Univest Priority Collateral through this action, Univest's collection efforts will be thwarted as a matter of practicality.

**4.     The Interests of Univest Are Not Be Adequately Represented By Plaintiff or the Defendants.**

- 5 -

6214597v.1

The final factor in assessing a request for intervention as of right is whether the interests of the proposed intervenor are already adequately represented in the ongoing litigation. The proposed intervenor need only show that, in general, the representation of its interest "may be inadequate," and the burden of making that showing is "minimal." Trbovich v. United Mine Workers, 404 U.S. 528, 538 n.10 (1972). Representation will be considered inadequate on any one of the following three grounds:

(1)    that although the applicant's interests are similar to those of a party, they diverge sufficiently that the existing party cannot devote proper attention to the applicant's interests;

(2)    that there is collusion between the representative party and the opposing party; or

(3)    that the representative party is not diligently prosecuting the suit.

Hoots v. Pennsylvania, 672 F.2d 1133, 1135 (3d Cir. 1982).

As demonstrated by the fact that Plaintiff overlooked and/or ignored Univest's interests in Whitmoyer's assets, only Univest has an interest in preserving and realizing on its collateral.

**B.     Pursuant To Fed. R. Civ. P. 24(b), Permissive Intervention By Univest Is Also Proper.**

Federal Rule of Civil Procedure 24(b) governs permissive intervention and provides, in relevant part:

Upon timely application anyone may be permitted to intervene in an action . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common . . . . (3) In exercising its discretion the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24(b)(2). The district court's discretion with regard to a motion for permissive intervention is very broad. <u>New York News, Inc. v. Kheel</u>, 972 F.2d 482, 487 (2d Cir. 1992); Under the facts averred, this Court should grant the request of Univest for permission to intervene.

As discussed more fully above, this motion was timely filed and supports an order permitting intervention by Univest pursuant to Fed. R. Civ. P. 24(b)(2).

### 1. Univest Bank Has A Claim or Interest In Common With Issues In The Main Action.

In analyzing a request for intervention pursuant to Fed. R. Civ. P. 24(b)(2), the words "claim" and "defense" are not to be read in a technical sense, but only require some "interest" on the part of the applicant. <u>Dow Jones</u>, 161 F.R.D. at 251; 3B Moore's Federal Practice (2d ed.) ¶ 24.11. Here, the interests of Univest in the assets of Whitmoyer are directly implicated by the Complaint and relief sought in the proceeding. Univest thus has a claim or interest involving questions of law or fact sufficiently in common with the main action so as to permit its intervention pursuant to Fed. R. Civ. P. 24(b)(2).

### 2. The Intervention of Univest Bank Will Not Unduly Delay or Prejudice the Rights of the Original Parties.

A principal consideration under Fed. R. Civ. P. 24(b)(2) is whether the intervention will "unduly delay or prejudice" the adjudication of the rights of the original parties. <u>United States Postal Serv. v. Brennan</u>, 579 F.2d 188, 191 (2d Cir. 1978) (emphasis added). Univest has no intention of interfering with the rights of GMF in collateral for which it has priority and GMF will not be prejudiced by Univest's intervention in this case. On the other hand, Univest may be unfairly injured if it is excluded from participating in this case. Moreover, permitting Univest to intervene will promote judicial economy and efficiency by avoiding a separate proceeding in which Univest seeks to recoup any proceeds of the Univest Priority Collateral.

## III.    CONCLUSION

6214597v.1

For all of the foregoing reasons, Univest Bank, respectfully requests that this Court grant its motion and permit it to intervene as a party in the litigation.

Respectfully submitted,

/s/ Julie M. Murphy
Julie M. Murphy Esquire
STRADLEY RONON STEVENS & YOUNG LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Telephone:  (856) 321-2409
Facsimile:  (215)564-8120
Email:  jmmurphy@stradley.com
*Counsel for Univest Bank and Trust Co.*

Dated: May 12, 2025                    /s/ Matts Batryn
                                       Matts Batryn, Esq.

6214597v.1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AMERICREDIT FINANCIAL SERVICES, INC. d/b/a GM FINANCIAL, <br><br> Plaintiff, <br><br> v. <br><br> WHITMOYER CHEVROLET, INC., STEVEN BA. KAHLON, and KINLEY CO. VENTURES, INC. <br><br> Defendants. | : <br> : <br> : <br> : No. 5:25-CV-01945 (JMG) <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

### AFFIDAVIT OF PETER SCIRROTTO

| COMMONWEALTH OF PENNSYLVANIA | : |
|---|---|
|  | : SS |
| COUNTY OF MONTGOMERY | : |

Peter Scirrotto, being duly sworn according to law deposes and states as follows:

1.      I am a Senior Vice President of Univest Bank and Trust Company ("Univest").

2.      Univest is a secured creditor of Whitmoyer Chevrolet, Inc. ("Whitmoyer"). by virtue of Whitmoyer granting to Univest a blanket lien and security interest in all of Whitmoyer's existing and after-acquired assets, including without limitation, all of Whitmoyer's accounts, inventory, equipment, general intangibles, chattel paper, documents and all proceeds of the foregoing (the "Collateral").

3.      The foregoing liens and security interests were granted to Univest and perfected pursuant to, among other things, the following documents, copies of which are attached hereto as Exhibit A:

a. Loan and Security Agreement, dated January 4, 2023, as modified by, among other things, the Third Loan Modification Agreement, dated December 17, 2024, and

b. That certain UCC-1 Financing Statement v filed on December 19, 2024, with the Pennsylvania Department of State at File No. 20241219284570 (the "UCC-1 ").

4.     Whitmoyer is indebted to Univest for, among other things, a revolving line of credit in the maximum principal amount of $9,500,000.00, which, as of May 1, 2025 was fully due and payable in the amount of $8,347,080.77 (exclusive of accrued and accruing interest, attorneys' fees and other fees and charges reimbursable under the associated loan documents).

5.     On or about November 20, 2024, Univest and AmeriCredit Financial Services, Inc. ("Plaintiff") entered into an Intercreditor Agreement.  A true and correct copy of the Intercreditor Agreement is attached hereto as Exhibit B.

6.     On May 8, 2025, Univest received a Notification of Disposition of Collateral from GMF (the "Notice of Disposition"), a true and correct copy of which is attached hereto as Exhibit C.

7.     Univest did not receive any notification of the commencement of the above-captioned litigation.

8.     Rather, Univest learned of the litigation after its counsel reached out to Plaintiff in response to the Notice of Disposition.

Dated: May 12, 2025

Peter Scirrotto, Senior Vice President

Sworn and subscribed to this 12th
day of May, 2025:

Notary Public

Commonwealth of Pennsylvania - Notary Seal
ANDREA L CALSAM - Notary Public
Montgomery County
My Commission Expires November 18, 2026
Commission Number 1427418

- 3 -

**EXHIBIT A**

**Loan Agreement and UCC-1**

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (the, "**Agreement**") is made this __4__ day of January 2023 by and between **GEORGE D. MANDERBACH, INC.**, a Pennsylvania corporation, with a principal place of business at 301 S. Front Street, Hamburg, PA 19526 (the, "**Borrower**"); **UNIVEST BANK AND TRUST CO.**, a Pennsylvania financial institution, having an address of 14 North Main Street, Souderton, PA 18964 (the, "**Lender**"); **GBD REAL ESTATE, LLC**, a Pennsylvania limited liability company ("Real Estate LLC"); **GDM LEASING INC.**, a Pennsylvania corporation ("Leasing Inc."); **KINLEY MOTOR CARS LLC**, a Montana limited liability company ("Kinley LLC"); and, **TETON GROUP LLC**, a Pennsylvania limited liability company ("Teton LLC") (jointly  and severally, the "Guarantors").

### WITNESSETH:

WHEREAS, Borrower has requested Lender extend a working capital line of credit up to the maximum principal amount of TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 ($2,500,000.00) DOLLARS (the, "Loan") which Lender is willing to extend under the terms and conditions of this Agreement.

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements herein contained, and intending to be legally bound, hereby agree as follows:

### ARTICLE 1 – DEFINITIONS

Section 1.01 <u>Definitions</u>.  In addition to other words and terms defined elsewhere in this Agreement, as used herein, the following words and terms shall have the following meanings, respectively, unless the context hereof otherwise clearly requires:

"Affiliate" means any Person: (1) which, directly or indirectly, controls, or is controlled by, or is under common control with, the Borrower, a surety, or a subsidiary; (2) which, directly or indirectly, beneficially owns or holds five percent (5%) or more of any class of the voting stock or the partnership units of, as the case may be, the Borrower, any surety, or any subsidiary; or (3) five percent (5%) or more of the voting stock or partnership units of which is directly or indirectly beneficially owned or held by the Borrower, a surety, or a subsidiary.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" means this Loan and Security Agreement, including all exhibits and schedules hereto, if any, as the same may be amended, modified, or supplemented from time to time.

"Anti-Terrorism Statute" shall mean any law relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Bona Fide Sales Contract" means a written, fully executed contract for the sale of a motor vehicle to a Governmental Entity under and pursuant to which the Governmental Entity is bound to pay a sum certain for an identifiable motor vehicle.

"Business Day" means a day other than a Saturday, Sunday, or other day on which commercial Lenders are authorized or required to close under the laws in effect in the Commonwealth of Pennsylvania.

"Capital Expenditures" means expenditures for any fixed assets, plant, equipment or improvements, replacements, substitutions, or additions thereto which have a useful life or more than one year, including assets acquired pursuant to a Capital Lease.

"Capital Lease" means any lease for property (real, personal, or mixed, including but not limited to equipment) under which any Borrower is the lessee and which, in accordance with GAAP, is or should be capitalized on the books of such Borrower.

"Collateral" means all of the present and future property and property rights of any kind or nature, whether real, personal, or mixed, of Borrower including, without limitation:

(1)    *Accounts:*    Meaning, all of such Borrower's present and future accounts, contracts, chattel paper, instruments and documents, and all other rights to the payment of money, whether or not yet earned, for services rendered or goods sold, consigned, leased or furnished by the undersigned, together with all general intangibles, guaranties and securities relating to any of the foregoing, and all returned, reclaimed or repossessed goods the sale, consignment, lease or other furnishing of which shall have given or may give rise to any of the foregoing, including, without limitation, the right of stoppage in transit.

(2)    *Inventory*:    Meaning, all of such Borrower's present and future inventory (including but not limited to goods held for sale or lease or furnished or to be furnished under contracts of service, raw materials, work in process, and goods used or consumed in business) whether owned, consigned or held on consignment, together with all merchandise, component materials, supplies, incidentals, office supplies, packaging materials and other goods or items used or to be used in connection with inventory, all present and future documents, instruments and general intangibles (including but not limited to manufacturing and processing rights, patents, patent rights, licenses, trademarks, trade names, trade secrets and copyrights) pertaining to or utilized in the consumption, sale, consignment, lease, promotion, shipment or storage of inventory, and all returned, reclaimed or repossessed goods sold, consigned, leased or otherwise furnished by the undersigned.

(3)    *Equipment*:    Meaning, all such Borrower's present and future machinery, motor vehicles, mobile or motorized equipment or machinery, office furniture, office equipment, fixtures, hand tools, power tools, dies, jigs, molds, blueprints, renderings, technical data, technical processes and prototypes and other

equipment, machines, machinery or articles of tangible personal property of every type, and all parts, substitutions, accretions, accessions, attachments, accessories, additions, components and replacements of equipment, with the exception of any such property that is subject to a Capital Lease, together with all documents, instruments and general intangibles relating to equipment, including but not limited to trademarks, trade names, trade styles, copyrights, brands, patents, patent rights, licenses, trade secrets, and all manuals of operation, maintenance or repair, utilized in connection with equipment.

(4)    *General Intangibles*:  Meaning, all of such Borrower's present and future general intangibles, as defined in the Uniform Commercial Code, including but not limited to all rights, claims, benefits and proceeds under insurance policies, customer lists, choses in actions, books, records, patents and patent applications, copyrights, service marks, trademarks, tradenames, blueprints and plans, trade secrets, sales contracts, licenses, formulas, tax and other types of refunds, tax attributes including carry-overs and carry-backs, returned and unearned insurance premiums, claims, product designs, drawings and technical data.

(5)    *Investment Property*:  Meaning all of such Borrower's present and future investment property, as defined in the Uniform Commercial Code, including but not limited to all investment securities, stock, mutual fund accounts, brokerage accounts, investment accounts, and all assets maintained in any of the foregoing types of accounts.

(6)    *Instruments*:  Meaning all of such Borrower's present and future instruments, as defined in the Uniform Commercial Code, including, but not limited to, all promissory notes (whether or not negotiable) or other instruments evidencing any right to payment.

(7)    *Documents*:  Meaning all of such Borrower's present and future property documents, as defined in the Uniform Commercial Code, including, but not limited to, all documents, documents of title, bills of lading, warehouse receipts and other similar or related items.

(8)    *Chattel Paper:*  Meaning all of such Borrower's present and future chattel paper, as defined in the Uniform Commercial Code.

(9)    *Electronic Chattel Paper*:  Meaning all of such Borrower's present and future electronic chattel paper, as defined in the Uniform Commercial Code.

(10)    *Deposit Accounts*: Meaning all of such Borrower's present and future deposit accounts, as defined in the Uniform Commercial Code.

(11)    *Letter Of Credit Rights:*  Meaning all of such Borrower's present and future property encompassed by the category described as letter-of-credit rights, as defined in the Uniform Commercial Code, including, but not limited to, all of the undersigned's rights under any one or more letters of credit with respect to which it is a beneficiary and including (without limitation) the right to assign any one or more

letters of credit and the right to demand payment under any one or more letters of credit.

(12)    *Commercial Tort Claims*:  Meaning all of such Borrower's present and future property encompassed by the category described as commercial tort claims, as defined in the Uniform Commercial Code.

(13)    *Supporting Obligations*:  Meaning all of such Borrower's present and future property encompassed by the category described as Supporting Obligations, as defined in the Uniform Commercial Code.

(14)    *Intellectual Property*:  Meaning all of such Borrower's existing and future patents, trademarks, service marks, copyrights (or applications relating to any of the foregoing) tradenames, technology, know-how, processes names and the likenesses used in or necessary to the conduct of the Borrowers' business, or works or items that are protectable as patents, trademarks, service marks, copyrights, tradenames, know-how and all other assets or rights consisting of, or commonly known as intellectual property, and all goodwill associated with all of the foregoing.

The term "Collateral" also includes, without limitation, all instruments, documents of title, policies and certificates of insurance, securities, bank deposits, deposit accounts, checking accounts, cash and currency; all proceeds (including insurance proceeds) and products and all accessions, substitutions and replacements and proceeds of and to any of the Collateral; and all ledger sheets, files, books, ledgers, invoices, receipts, records, documents and instruments (including, without limitation, computer programs, tapes and related electronic data processing hardware and software) ("Books and Records") relating to any of the Collateral.

"Debt" means the outstanding principal amount of the Loans, together with all interest accrued and unpaid thereon, and all other sums due to Lender in respect of the Loans, the Notes, this Agreement, or any other Loan Document.

"EBITDA" means, for any period, earnings from continuing operations before payment of federal, state and local income taxes, interest expense, depreciation and amortization, in each case for such period, computed and calculated in accordance with GAAP.

"Environmental Condition" means any condition affecting: (i) the workplace where business operations take place, or (ii) any natural resource, including, without limitation, the air, soil, surface, and groundwater which must be reported to a Governmental Authority or which must be remediated under any of the Environmental Laws.

"Environmental Law" means any presently existing or hereafter enacted or decided federal, state, or local statutory or common laws relating to pollution or protection of the environment, including, without limitation, any common law of nuisance or trespass, and any law or regulation relating to emissions, discharges, releases, or threatened release

of pollutants, contaminants, or chemicals, or industrial, toxic, or hazardous substances or wastes into the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, or chemicals, or industrial, toxic, or hazardous substances or wastes.

"GAAP" means generally accepted accounting principals, which is a widely accepted set of rules, conventions, standards, and procedures for reporting financial information, as established by the Financial Accounting Standards Board.

"Governmental Entity" means a Pennsylvania local governmental unit such as a borough, a township, a county, or a school district, or any department or agency thereof.

"Governmental Authority" means any federal, state, local, or foreign government and any agency, commission, or other entity thereof authorized to enforce any of the Environmental Laws.

"Hazardous Materials" means any contaminants, hazardous substances, regulated substances, or hazardous wastes that may be the subject of liability pursuant to any Environmental Law.

"Indebtedness" has the same meaning as Debt.

"Lien" means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), or preference, priority, or other security agreement or preferential arrangement, charge, or encumbrance of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction to evidence any of the foregoing).

"Loan" means the Loan as defined in Section 2.01 hereof.

"Loan Document(s)" means this Agreement, the Note, and all other documents, instruments, and/or applications of any kind relating to, evidencing, and/or securing the Loans.

"Maturity Date" means the Maturity Date as defined in the Note.

"Note" means the Note of the Borrower executed and delivered the same date as this Agreement evidencing the Loan defined in Article II of this Agreement, which shall provide, inter alia, for the terms of repayment of the Loan, together with all extensions, renewals, re-financing, or re-funding, in whole or in part.

"Obligations" means the Indebtedness of the Borrower evidenced by its Note or by any other Loan Document, including but not limited to any past, present, or future advances,

renewals, extensions, and modifications thereof, and all interest, late charges, costs, and fees of any type to be paid thereunder, and any and all other indebtedness of Borrower to Lender, direct or indirect, due or to become due, now existing or hereafter contracted of any nature whatsoever, including all present and future obligations of Borrower under any interest hedging with Lender; including all costs and expenses (including reasonable attorney's fees), incurred by Lender in the disbursement, administration, and collection of the Loans evidenced by the Note; (b) all costs and expenses (including reasonable attorney's fees), incurred by Lender in the protection, maintenance, and enforcement of the security interests granted herein; (c) all obligations of the Borrower in any other agreement relating to the Note; and (d) any modifications, renewals, refinancings, or extensions of the foregoing obligations.

"Obligor(s)" means the Borrower, Guarantors, and any other person or entity liable, either absolutely or contingently, for the payment of any Obligations to the Lender, evidenced by any Loan Document or otherwise, as well as any person or entity granting the Lender a security interest or Lien upon or in property (real or personal) to secure payment of all or a portion of said Obligations.

"Person" means an individual, partnership, corporation, trust, limited liability company, limited liability partnership, unincorporated association or organization, joint venture or any other legal entity.

"Potential Event of Default" means the existence of any situation (but only for so long as it exists) which, if not cured or corrected within a certain period of time after the giving of notice by Lender, will constitute an Event of Default under Article VIII of this Agreement or the "Event of Default" provisions of any other Loan Document.

"Premises" means the real property and all improvements situate thereon located at and known as 301 S. Front Street, Hamburg Borough, Berks County, PA, being Berks County Tax Parcel No 46448408983283.

"Regulated Substances" includes any substances, chemicals, materials, or elements that are prohibited, limited, or regulated by the Environmental Laws, or any other substances, chemicals, materials, or elements that are defined as "hazardous" or "toxic," or otherwise regulated, under the Environmental Laws, or that are known or considered to be harmful to the health or safety of occupants or users of the Premises.

"Uniform Commercial Code" means the Uniform Commercial Code of the Commonwealth of Pennsylvania, as the same may be amended from time to time, and any successor statute.

"USA Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

## ARTICLE 2 – WORKING CAPITAL LINE OF CREDIT

Section 2.01 <u>Loan Amount</u>.  Lender agrees, on the terms and conditions of this Agreement and the Note, to extend a credit facility to the Borrower in the form of a line of credit in the principal amount of up to TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 ($2,500,000.00) DOLLARS, pursuant to which, from time to time, Lender may make advances to the Borrower in such amounts as the Borrower may request, up to an aggregate amount outstanding at any given time not in excess of TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 ($2,500,000.00) DOLLARS.  The Borrower covenants and agrees that, in the event the outstanding balance of the sums advanced under the Loan or any portion thereof should exceed, at any time and for any reason, the borrowing limit set forth in this Section 2.01, the full amount of such excess, with any interest and fees accrued and unpaid thereon or in connection therewith, shall be due and payable within five (5) days of Borrower's receipt of Lender's notice of such excess. The parties agree that the Lender shall have no obligation to make advances of the Loan at any time after any Event of Default (that has not been waived in writing by the Lender) has occurred or if a Potential Event of Default then exists, or if, in its discretion, it determines that the credit risk level warrants such suspension.

Section 2.02 <u>Payment Terms</u>.

(a)    The obligation of Borrower to repay the principal amount of the Loan and to pay interest thereon shall be evidenced by its Note in the principal amount of TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 ($2,500,000.00) DOLLARS of even date herewith, as the same may hereafter be amended (the, "Note").

(b)    Borrower shall repay the full amount of each Advance (as defined below) within ninety (90) days and any amount not repaid after ninety (90) days shall be automatically debited from its operating account with Lender.

Section 2.03 <u>Procedures for Advances</u>.  Cash advances of the Loan which may be made by Lender from time to time ("Advance(s)") shall be made available by crediting such proceeds to Borrower's operating account with Lender, on and subject to satisfaction of each of the following conditions:

(a)    Only upon Lender's receipt of Bona Fide Sales Contract shall Lender make an Advance.

(b)    The Advance shall be for one hundred (100%) percent of the purchase price in the Bona Fide Sales Contract.

(c)    Borrower shall provide Lender with monthly aging report of all Bona Fide Sales Contracts that are then outstanding.

Section 2.04 <u>Advance Not Waiver</u>.  Any Advance by Lender of Loan proceeds hereunder made prior to or without the fulfillment by Borrower of all of the conditions precedent thereto, whether or not known to Lender, shall not constitute a Waiver by

Lender of the requirement that all conditions, including the non-performed conditions, shall be required with respect to all future advances.

Section 2.05 <u>Certain Limitations on Advances</u>.  Termination of the Line of Credit shall not release the security interests granted to the Lender or terminate any other rights of the Lender (unless and until all Obligations of Borrower under the Loan Documents have been paid in full).

Section 2.06 <u>Use of Proceeds</u>.  Borrower shall use the proceeds of the Loan as working capital.

Section 2.07 <u>Commitment Fee</u>.  In consideration of the Loan, Borrower shall pay to Lender a fee in the amount of TWO THOUSAND FIVE HUNDRED AND 00/100 ($2,500.00) DOLLARS, as well as, all hard costs associated with the approval and closing of the Loan (including, but not limited to, filing fees and Lender's legal fees and expenses).

## ARTICLE 3 – CONDITIONS OF LENDING

Section 3.01 <u>Conditions Precedent to Funding of Loan and Initial Advance</u>.  The obligations of the Lender to make the Loan and advance funds from the Loan are subject to the condition precedent that each of the following shall have been satisfied to Lender's satisfaction:

        (a)    The following loan documents each in form and substance satisfactory to the Lender shall be duly executed and delivered by Borrower and each Obligor, as the case may be, to Lender:

        1) This Loan and Security Agreement;

        2) Note in principal amount of $2,500,000.00;

        3) Guaranty and Surety Agreements of Guarantors;

        4) Acknowledgements of Confession of Judgment from Borrower and Guarantors;

        5) UCC-1 Financing Statement for the Loan on all assets of the Borrower;

        6) Errors and Omissions Affidavit;

        7) Landlord's Lien Waiver; and,

        8) Such other and further Loan Documents as may be reasonably required by the Lender.

(b)    The payment of all legal, recording, filing fees, and other expenses (including, but not limited to, those relating to appraisals and environmental studies) incurred by the Lender in connection with the Loan and the transactions contemplated thereby;

(c)    Certificates or policies of insurance in accordance with the requirements of Article 6, below, and in any other Loan Document;

(d)    Payment of the Loan Fee(s) referenced in Section 2.07 above;

(e)    Organizational Documents.    The following organizational and corporate, partnership, or comparable documents for Borrower and Guarantor, as well as for any shareholder, member, partner, or other equity owner, if such Borrower, Guarantor, shareholder, member, partner, or other equity owner is an entity:

1) True and complete copies of the articles of incorporation, by-laws, the certificate of organization and operating agreement, as the case may be, and all amendments thereto;

2) A current good-standing/subsistence certificate from: (A) the jurisdiction of its incorporation or formation and, (B) from the jurisdiction in which the Collateral is located, if such jurisdiction is different from the jurisdiction of Borrower's and/or Guarantor's state of incorporation or formation;

3) A resolution, certified by the corporate secretary or the managing member, general partner or other appropriate party, as the case may be, authorizing the consummation of the transactions contemplated hereby and the execution, delivery and performance of the Loan Documents to be executed, delivered or performed by said corporation, limited liability company, partnership or other entity;

4) A certificate of the corporate secretary, managing member, general partner or other appropriate party, as to the incumbency of the officers, members and/or partners executing any of the documents required hereby, and, if a Borrower or Guarantor, the mortgagor under any Mortgage (if different from Borrower or Guarantor), or any member of any of them is a limited liability company, partnership or other entity:

i.    The entity's operating, partnership or other organizational agreement and all amendments and attachments thereto, certified by a member, or other appropriate person, to be true and complete;

ii.    Any certificates, applications or other documents filed or required to be filed by the entity in the jurisdictions of its formation for it to do business in those jurisdictions; and

iii.    Any consents by members, partners or other equity holders required for the consummation of the transactions contemplated hereby.

(f)    The representations and warranties made to Lender herein, in the other Loan Documents, certificates or statements executed or delivered to Lender in connection with the Loan shall be true and correct, and all covenants of all Obligors shall have been complied with, in all material respects on and as of the date of closing;

(g)    Opinion Letter from Borrower's and Guarantor's counsel in form and substance reasonably satisfactory to Lender and Lender's counsel;

(h)    Execution and/or delivery to Lender of all instruments evidencing all security interests in and being all collateral identified in Article 4 hereof;

(i)    Such other and further documents as may be required reasonably by the Lender in order to consummate the transactions contemplated hereunder.

Section 3.02 <u>Conditions to Advance After the Initial Advance</u>. Lender's obligation to make advances of proceeds of the Loan after the initial Advance shall be subject to the satisfaction of the following conditions, and subject at all times to the limitations and terms of Article II:

(a)    All conditions of Section 3.01 shall have been and remain satisfied as of the date of such Advances;

(b)    There shall exist no Default or Event of Default;

(c)    The representations and warranties made to Lender herein, in the other Loan Documents and in any other document, certificate or statement executed or delivered to Lender in connection with the Loan shall be true and correct on and as of the date of the Advance with the same effect as if made on such date; and,

(d)    Lender shall have received a request for Advance, together with such other documentation and information as it may reasonably require, and as is required under Article II.

## ARTICLE 4 – SECURITY

Section 4.01 <u>Security Interests</u>.

(a)    Borrower hereby grants unto Lender a security interest in all of such Borrower's present and future Accounts, Deposit Accounts, Equipment, General Intangibles, Chattel Paper, Electronic Chattel Paper, Inventory, Instruments, Investment Property, Letter of Credit Rights, Documents, Intellectual Property and Commercial Tort Claims, Supporting Obligations, in which it now has or hereafter may acquire any interest, wherever located, and in all proceeds and products thereof, including insurance, and all replacements to the Collateral as more fully described in and under the terms of this Loan and Security Agreement; provided that such Collateral may be subject to liens in favor of Ford Motor Credit Corp., and purchase money security interest liens of record existing as of the date of closing of the Loans;

(b)      For value received, and because they will benefit from and by virtue of Lender's extension of the Loan to Borrower, and having determined that it is in their best interests to do so, Borrower and Guarantors, as applicable, further agree to and shall grant unto Lender, and execute and deliver to Lender, Guaranty and Surety Agreements of Guarantors securing all of Borrower's debts and obligations under the Note and the other Loan Documents.

(c)      For value received, and to secure the payment and performance of all Obligations under Note, Borrower and Guarantors hereby grant to Lender a security interest and a right of setoff as security for all liabilities and Obligations to the Lender, whether now existing or hereafter arising upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Lender or any entity under the control of the Lender, or in transit to any of them.  At any time after an Event of Default (that has not been waived in writing by the Lender), without demand or notice, the Lender may set off the same or any part thereof and apply the same to any liability or obligation of the Borrower and Guarantors even though unmatured and regardless of the adequacy of any other collateral securing the Loan.  ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER AND GUARANTORS, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.  The Lender shall not be required to marshal any present or future security for, or guarantees of the obligations or to resort to any such security or guarantee in any particular order and the Borrower and Guarantors waive, to the fullest extent that it lawfully can, (a) any right they might have to require the Lender to pursue any particular remedy before proceeding against them and (b) any right to the benefit of or to direct the application of the proceeds of any collateral until the obligations are paid in full.

Section 4.02 Perfection of Security Interests.  Borrower consents, without further notice, to Lender's filing or recording of any documents necessary to perfect, continue, amend or terminate its security interests. Upon request of Lender, Borrower must sign or otherwise authenticate all documents that Lender deems necessary at any time to allow Lender to acquire, perfect, continue or amend its security interest in the Collateral. Borrower will pay the filing and recording costs of any documents relating to Lender's security interest. Borrower ratifies all previous filings and recordings, including financing statements and notations on certificates of title. Borrower will cooperate with Lender in obtaining a Control Agreement satisfactory to Secured Party with respect to any Deposit Accounts or Investment Property, if any given as security, or in otherwise obtaining control or possession of that or any other Collateral.  Without limiting the general nature of the foregoing, to the extent that the Borrower shall acquire an interest in any Commercial Tort Claim, Borrower shall execute and deliver to the Lender such agreements, documents or instruments as the Lender may deem necessary or desirable under the Uniform Commercial Code (or otherwise) to perfect, protect, maintain and enforce its security interest in such Commercial Tort Claims.

Section 4.03 <u>Locations of Offices and Assets</u>.

(a)     Borrower represents and warrants that its jurisdictions of formation are as set forth in the opening paragraph of this Agreement, and that their respective chief executive offices and principal places of business (and the places where it keeps books and records concerning its Accounts and General Intangibles) are at the same address as well.  Borrower further represents and warrants that its Equipment and Inventory are located at the registered addresses as set forth above.

(b)     Borrower covenants and agrees that it shall give thirty (30) days prior written notice to the Lender of: (i) any change in the location of its chief executive offices or principal places of business; (ii) any change in the locations where it keeps its Equipment and its Inventory, or its books and records concerning Accounts and General Intangibles; (iii) any change in the name of Borrower; and (iv) the establishment of any new, or the discontinuance of existing, places of business.

Section 4.04 <u>Accounts</u>.

(a)     If any amounts are outstanding under any Loan, at the request of the Lender, upon the occurrence of an Event of Default (that has not been waived in writing by the Lender), Borrower shall remit collection on its Accounts daily to the Lender in the form received, duly endorsed, for deposit to a cash collateral account with the Lender or any of its affiliates.  The Lender and any of its affiliates may, in their reasonable discretion, at any time, apply all or any portion of the collected balance in the cash collateral account as a credit against the Indebtedness.  If any remittance shall be dishonored or, if upon final payment, any claim with respect to any remittance shall be made against the Lender on its warranties of collection, the Lender or any of its affiliates may charge the amount of an item against the cash collateral account or any other deposit account maintained by Borrower with the Lender or any of its affiliates, and in any event retain same, and the interest of Borrower as additional security for the Indebtedness. The balance in the cash collateral account shall be additional security for the Indebtedness and shall be subject to withdrawal by Borrower only upon final payment in full of the Indebtedness.

(b)     If any amounts are outstanding under any Loan, at the request of the Lender, upon the occurrence of an Event of Default (that has not been waived in writing by the Lender), Borrower shall cause all remittances representing proceeds of its Accounts to be mailed to a lock box opened by the Lender, to which the Lender shall have sole access for the processing of remittances in accordance with the provisions of the Lender's customary lock box arrangements.  The Lender shall, at its election, have the right at any time, to notify the account debtors on all or any part of the Accounts of the Lender's security interest, and to require that all payments with respect to such Accounts be made directly by the account debtor to the Lender.  All reasonable fees and expenses incurred by the Lender in the collection of any Account, including reasonable fees and expenses of counsel and court costs, shall be paid by Borrower.

(c)     Borrower represents and warrants that:  (i) its Accounts arise from a bona fide sale and delivery of goods or the due performance of services by Borrower, and

will be for a liquidated amount without offset, deduction, counterclaim, condition precedent or conflicting security interest (other than offsets, deductions and similar claims that arise in the ordinary course of Borrower's business and do not have a material adverse effect on its  business operations or the Collateral); (ii) Borrower has and will have absolute title to its Accounts and, except as against a purchaser of goods from such Borrower to any goods represented thereby, free and clear of any and all liens, encumbrances, security interests or other rights, excepting only the rights and security interests granted to the Lender; and (iii) the Accounts have not been assigned, transferred or sold to any other person or entity, and no person or entity has any claim to the Accounts or, with the exception of a purchaser of goods from the Borrower to any goods represented thereby. Borrower shall segregate all returned goods or other goods or Inventory in its possession represented by Accounts and shall provide the Lender on request with copies of invoices, contracts and agreements with customers and account debtors, notices of any claim to offsets, counterclaims or back charges with respect to any Accounts.

(d)     If any amounts are outstanding under any Loan, upon the occurrence of an Event of Default (that has not been waived in writing by the Lender), Borrower constitutes the Lender or its agents, or any other person whom the Lender may designate, as its attorney to exercise at any time all of the following powers, which, being coupled with an interest, shall be irrevocable until the Indebtedness has been paid finally and in full, (i) to receive, take, endorse, assign, deliver, accept and deposit in the name of the Lender or of such Borrower any and all cash, checks, notes, drafts, remittances and other instruments and documents relating to Accounts and proceeds thereof; (ii) to receive, open and dispose of all mail addressed to such Borrower, and notify postal authorities in its name and the name of such Borrower to forward such mail directly to the Lender; (iii) to transmit to the persons indebted on the Accounts notice of the Lender's interest in the Accounts, and to request from such persons at any time, in the name of such Borrower, or the name of the Lender, information concerning the Accounts and the amounts owing on the Accounts; (iv) to notify the persons indebted on the Accounts to make payment directly to the Lender; and (v) to take or bring, in the name of such Borrower or the name of the Lender, all steps, actions, suits or proceedings deemed by the Lender necessary or desirable to effect collection of the Accounts.  Without limitation of any of the foregoing powers, the Lender is authorized to accept and deposit all collections in any form relating to the Accounts, including any remittances which may reflect deductions.  Borrower releases the Lender and its officers, employees and agents from any liability arising from any act or acts under or in furtherance of this Section 4.04, whether of omission or commission, or whether based upon any error or judgment or mistake of law or fact, except acts involving bad faith, gross negligence or willful misconduct.

Section 4.05 Equipment and Inventory.

(a)     Borrower represents and warrants that it is the absolute owner of its Inventory and Equipment (other than Equipment leased by such Borrower), free and clear of any and all liens, encumbrances, security interests or other rights, excepting only the rights and security interests granted to the Lender, or otherwise permitted in Article IV of this Agreement.

{11060326; 4}                           13

(b)      Borrower will not sell, lease, license or otherwise transfer (including by granting security interests, liens, or other encumbrances in) all or any part of the Collateral or such Borrower's interest in the Collateral without Lender's written or electronically communicated approval, except that Borrower may sell any Collateral in the ordinary course of business on customary terms. Borrower may collect and use amounts due on accounts and other rights to payment arising or created in the ordinary course of business, until notified otherwise by Lender in writing or by electronic communication.

Section 4.06 <u>Records and Reports</u>.  Borrower shall keep accurate and complete records of the Collateral and shall furnish the Lender with any information about the Collateral as the Lender may from time to time reasonably request. Borrower shall not, without at least sixty (60) days prior written notice to the Lender, change its jurisdiction of incorporation or other formation or organization.

Section 4.07 <u>Insurance; Discharge of Taxes</u>.  Borrower must: (a) maintain the Collateral in good condition; (b) pay promptly all taxes, judgments, or charges of any kind levied or assessed thereon; (c) keep current all rent or mortgage payments due, if any, on premises where the Collateral is located; and (d) maintain hazard insurance on the Collateral, with an insurance company and in an amount approved by Lender (but in no event less than the replacement cost of that Collateral), and including such terms as Lender may require including a Lender's Loss Payable Clause in favor of Lender. Borrower authorizes the Lender, from time to time and if such Borrower fails to do so, without notice to Borrower to: (a) obtain insurance covering any of the Collateral; (b) discharge taxes, liens, security interests or other encumbrances at any time levied or placed on any of the Collateral; and (c) pay for the maintenance and preservation of any of the Collateral. Borrower shall reimburse the Lender, on demand, for any payment made or any expense incurred by them pursuant to this authorization. Borrower assigns to the Lender the right to receive the proceeds of insurance covering the Collateral up to the amount outstanding under the Loans, and all unearned premiums thereon, and authorizes the Lender to direct any insurer to pay all such proceeds directly to the Lender and to endorse in the name of Borrower on any draft for such proceeds.

Section 4.08 <u>Intellectual Property</u>.  Borrower owns, or has other right with respect to, all patents, copyrights, trademarks, tradenames, service marks and other Intellectual Property rights used by it in the operation of its business.

Section 4.09 <u>Power of Attorney</u>.  With respect to the execution and delivery of such agreements, documents or instruments which may be necessary or desirable to obtain, maintain or perfect the rights granted to the Lender in the Collateral, Borrower irrevocably appoints the Lender as its attorney-in-fact, with full power and authority to sign or endorse the name of Borrower as may be necessary to accomplish the foregoing purposes.

Section 4.10 <u>Notices</u>.  If notice of the sale, disposition or other intended action by the Lender with respect to the Collateral is required by the Uniform Commercial Code or other applicable law, any notice thereof sent to Borrower at the address specified in the preamble to this Agreement (or such other address of Borrower as may from time to time

be shown on the records of the Lender), at least five (5) Business Days prior to such action, shall constitute reasonable notice to Borrower.

Section 4.11 <u>Future Advances</u>.  The Obligations secured by this Agreement include all advances made at any time or times to or for the benefit of Borrower, whether obligatory or optional, including all costs, expenses, court costs and reasonable attorneys' fees incurred in the collection of the Obligations or the Collateral or the disposition of the Collateral, and any advances made at any time or times for the payment of taxes or insurance or the maintenance or repair of the Collateral, or for the establishment, maintenance or enforcement of the Lender's security interest in the Collateral.

Section 4.12 <u>Maintenance and Location of Collateral; Inspection</u>.  Borrower must promptly notify Lender by written or electronic communication of any change in location of the Collateral, specifying the new location.  Borrower hereby grants to Lender the right to inspect the Collateral at all reasonable times and upon reasonable notice.

## ARTICLE 5 – REPRESENTATIONS AND WARRANTIES

Section 5.01 <u>Representations and Warranties</u>.  In addition to the representations and warranties contained in the Notes or any other Loan Document, the Obligors hereby make the following representations and warranties, which shall be true and correct on the date hereof, and shall continue to be true and correct until the Loans shall have been paid in full.

Section 5.02 <u>Use of Proceeds</u>.  The proceeds of the Loans hereunder shall be used by the Borrower for the business purposes stated in Article II hereof.  No portion of the Loan is to be used for (i) the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. sections 221 and 224, or (ii) primarily personal, family or household purposes.

Section 5.03 <u>Legally Enforceable Agreements</u>.  The Obligors have the power to execute, deliver, and perform this Agreement and the other Loan Documents and when executed and delivered this Agreement and the other Loan Documents shall be legally valid and binding obligations of the Obligors, enforceable in accordance with their terms.

Section 5.04 <u>Organization, Good Standing and Due Qualification</u>.  If the Borrower and/or any other Obligor or any general partner of Borrower or of any other Obligor is a corporation or a partnership or a limited liability company, the Borrower or such other Obligor or general partner is duly organized, validly existing, and in good standing under the laws of the jurisdiction in which the Borrower, other Obligor, or general partner is incorporated or formed; has the power and authority to own its assets and to transact the business in which it is now engaged or proposed to be engaged in; and is duly qualified and in good standing under the laws of each other jurisdiction in which such qualification is required, except where the failure to qualify would not have a material adverse effect on the financial condition, properties or operations of the Borrower.

Section 5.05 <u>Conflicts</u>.    The execution, delivery, and performance of this Agreement and the Loan Documents will not violate any provision of any indenture, agreement, or other instrument to which the Borrower, any other Obligor, or any of their properties or assets including the collateral are bound, and will not be in conflict with, result in a breach of, or constitute (with due notice and/or lapse of time) a default under any such indenture, agreement, or other instrument, or result in the creation or imposition of any lien, charge, or encumbrance of any nature whatsoever upon any of said properties or assets.

Section 5.06 <u>Consents</u>.  No authorization, consent, approval, license or exemption of, and no registration, qualification, designation, declaration or a filing with any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign is necessary to the valid execution and delivery by the Borrower of this Agreement and the other Loan Documents.

Section 5.07 <u>Financial Statements; Accuracy of Information</u>.

(a)    The most recent financial statements of Borrower and other Obligors delivered to the Lender are true and correct in all material respects and represent fairly its financial position as of the date thereof and the results of their operations or affairs for the period indicated, and show (including the footnotes) all known liabilities, direct or contingent, of Borrower and the other Obligors as of the date thereof, all in accordance with GAAP consistently applied.  Since the date of such financial statements, there has been no material adverse change in condition, financial or otherwise, of the Borrower or in its business and properties and, since such date, Borrower and the other Obligors have not incurred, other than in the ordinary course of business, any indebtedness, liabilities, obligations, or commitments, contingent or otherwise, except as otherwise reported to the Lender in writing.  No information, exhibit, or report furnished by the Borrower and the other Obligors to the Lender in connection with the negotiation of this Agreement contains any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statement contained therein not materially misleading.  All projections delivered by the Borrower and the other Obligors to the Lender were made on a reasonable basis and in good faith.  Except as disclosed to the Lender in writing, the Borrower and other Obligors have no material contingent liabilities (including liabilities for taxes), unusual forward or long-term commitments or unrealized or anticipated losses from unfavorable commitments.

(b)    All information, financial statements, exhibits, and reports furnished by the Borrower and the other Obligors to the Lender in connection with this Agreement and the borrowings contemplated hereby are, and all such information, financial statements, exhibits, and reports hereafter furnished by the Borrower and the other Obligors to the Lender, will be true and correct in every material respect on the date furnished to the Lender, and no such information, financial statements, exhibit, or report contains or will contain any material misstatement of fact or omits or will omit to state a material fact or any fact necessary to make the statement contained therein not materially misleading.

Section 5.08 <u>Litigation</u>.   To the best of Borrower's knowledge, information and belief, and except as previously disclosed in writing to the Lender prior to the date hereof, there is no pending or, to the knowledge of Borrower and the other Obligors, threatened action or proceeding against or affecting the Borrower or any other Obligors before any court, governmental agency, or arbitrator which may, in any one case or in the aggregate, materially adversely affect the financial condition, operations, properties, or business of the Borrower or any other Obligors or the ability of Borrower or any other Obligors to perform their obligations under any Loan Documents.

Section 5.09 <u>Other Agreements</u>.  No Borrower or other Obligor is a party to any indenture, loan, or credit agreement, or to any lease or other agreement or instrument (other than such agreements and instruments to which Lender and any Obligor are parties), or subject to any charter or corporate restriction which could have a material adverse effect on the business, properties, assets, operations, or conditions, financial or otherwise, of the Borrower or any other Obligor, or the ability of the Borrower or other Obligors to carry out their respective obligations under the Loan Documents to which each is a party.  Borrower and Obligors are not in default in any respect in the performance, observance, or fulfillment of any of the obligations, covenants, or conditions contained in any agreement or instrument material to its business to which it is a party.

Section 5.10 <u>No Defaults and Outstanding Judgments or Orders</u>.   Obligors have satisfied all judgments and are not in default with respect to any judgment, writ, injunction, decree, rule, or regulation of any court, arbitrator, or federal, state, municipal, or other Governmental Authority, commission, board, bureau, agency or instrumentality, domestic or foreign.

Section 5.11 <u>Other Obligations</u>.    Maintain all obligations of Borrower in whatsoever manner incurred, including, but not limited to, obligations for borrowed money or for services or goods purchased by Borrower, in a current status.

Section 5.12 <u>Liens on the Collateral</u>.  There exist no liens, encumbrances or other charges against the Collateral, or any portion thereof, or any property relating thereto, including statutory and other liens of mechanics, workmen, repairmen, professionals, contractors, suppliers, taxing authorities and others, except for liens for taxes not yet due and the security interests created hereby and other interests granted to Lender, except as has been disclosed in writing to Lender by Borrower or by the title company.  Borrower has made no contract or arrangement of any kind the performance of which by the other party thereto could give rise to a lien on the Collateral, or any portion thereof, by operation of law or otherwise.

Section 5.13 <u>Operation of Business</u>.  Borrower possesses: (i) all material licenses, permits, and other governmental authorizations, and (ii) all material franchises, trademarks, tradenames, copyrights, patents, and other Intellectual Property rights, or rights in any of the foregoing, adequate for the conduct of its business as now conducted and presently proposed to be conducted, without conflict with the material rights or claimed rights of others.

Section 5.14 <u>Taxes</u>.    Borrower and each other Obligor have filed all tax returns (federal, state, and local) required to be filed and have paid all taxes, assessments, and governmental charges and levies due thereon, including interest and penalties.

Section 5.15 <u>Debt</u>.  Borrower and the other Obligors are not indebted under any credit agreement, indenture, purchase agreement, guaranty, Capital Lease, or other investment, agreement, or arrangement except as disclosed in their respective financial statements referred to herein or except Debt, if any, which is specifically permitted by the terms of this Agreement.

Section 5.16 <u>Environment</u>.  Borrower has duly complied with, and its businesses, operations, assets, equipment, property, leaseholds, or other facilities are in compliance with, the provisions of all Environmental Laws, and all health and safety laws and codes, and all rules and regulations promulgated thereunder except where the failure to comply would not have a material adverse effect on the financial condition, properties or operations of Borrower; and has not received notice of, or knows of, or suspects facts which might constitute a violation of any Environmental Law, or any health and safety law and code, or any rules or regulations promulgated thereunder, with respect to its businesses, operations, assets, equipment, property, leaseholds, or other facilities.

Section 5.17 <u>Anti-Terrorism Statutes</u>.

(a)    <u>General</u>.  No Obligor is in violation of any Anti-Terrorism Statute, nor do any of them engage in, or conspire to engage in, any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Statute.

(b)    <u>Executive Order No. 13224</u>.  No Obligor, nor any of their respective Affiliates or agents, acting or benefiting in any capacity in connection with any of transactions contemplated by this Agreement, is any of the following (each a "Blocked Person"):

1) A Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

2) A Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

3) A Person or entity with which the Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Statute;

4) A Person or entity that commits, threatens, or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

5) A Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign

Asset Control at its official website or any replacement website or other replacement official publication of such list; or

        6) A Person or entity who is an Affiliate of a Person or entity listed above.

No Obligor, nor any of their respective Affiliates or agents, acting in any capacity in connection with the Loan made hereunder or other transactions contemplated hereby: (A) conducts any business with, or engages in making or receiving any contribution of funds, goods, or services to, or for the benefit of, any Blocked Person, or (B) deals in, or otherwise engages in, any transaction relating to any property or interests in property blocked pursuant to the Executive Order No. 13224.

        (c)    <u>Sanctioned Persons</u> . None of the Obligors, nor any of their Affiliates, if any, is a Person: (i) named on the list of Specially Designated Nationals or Blocked Persons maintained by the United States Department of the Treasury's Office of Foreign Assets Control or any successor thereto ("OFAC") available at http://www.treas.gov/offices/eotffc/ofac/sdn/index.html or as otherwise published from time to time, or (ii) (A) an agency of the government of a Sanctioned Country (as defined below), (B) an organization controlled by a Sanctioned Country, or (c) a Person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC (each a "Sanctioned Person").

        (d)    <u>Sanctioned Countries</u>. No Obligor, or their respective Affiliates, if any, does business in a country subject to the sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/eotffc/ofac/sanctions/index.html, or as otherwise published from time to time (a "Sanctioned Country").

        (e)    <u>Use of Loan Proceeds</u>. The proceeds of any Loan will not be used to fund any operation in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country.

    Section 5.18 <u>Accurate and Complete Disclosure</u>. No representation or warranty made by the Obligors under this Agreement or any Loan Document is false or misleading in any material respect (including by omission of material information necessary to make such representation, warranty or statement not misleading).

## ARTICLE 6 – AFFIRMATIVE COVENANTS

**<u>Affirmative Covenants of Obligors</u>**. In addition to the covenants contained in the other Loan Documents, the Borrower and Guarantors, as the case may be, hereby covenant and agree that, so long as any part of the Loan is outstanding, the Obligors shall do or cause to be done the following, except as the Lender may otherwise agree in writing:

    Section 6.01 <u>Financial Statements and Reports</u>. Borrower shall furnish to Lender:

(a)     Accountant-prepared and reviewed financial statements within 120 days of calendar year-end beginning with calendar year 2022;

(b)     Consolidating and Consolidated reviewed financial statements within 120 days of calendar year-end beginning with calendar year 2022;

(c)     Covenant compliance certificate within 120 days of calendar year-end beginning with calendar year 2022;

(d)     Dealer statements within 45 days of March 31, June 30, September 30, and December 31 every year; and,

(e)     Within 15 days of each calendar month-end, monthly aging reports of all Bona Fide Sales Contracts with supporting information with which to track status of all then-outstanding Advances.

Section 6.02. Tax Returns.  Borrower and all Guarantors shall, within 120 days of calendar year end, provide Lender with signed copies of all federal tax returns required to be filed by such Obligor for the immediately preceding tax year; provided, however, that if any such return is filed on or pursuant to an extension, then a copy of the extension shall be provided to Lender within 120 days of year end and said return shall be provided to Lender no later than the last day of the month in which such return is due.

Section 6.03 Payment of Taxes.  Duly pay and discharge all taxes, assessments, and governmental charges levied upon, or assessed against, Obligors, their respective properties, or their income prior to the date on which penalties are attached thereto, and within thirty (30) days from the date thereof, or upon payment, whichever is earlier, deliver to the Lender a receipt from the applicable Governmental Authority evidencing said payment, unless and except to the extent only that such taxes, assessments, and charges shall be contested in good faith by appropriate proceedings, diligently conducted by Borrower (unless and until foreclosure, distraint, sale, or other similar proceedings shall have been commenced), and provided that such reserves as shall be required by generally accepted accounting principles shall have been made therefor.

Section 6.04 Access to Properties, Books and Records.  Permit any of the officers, employees, or representatives of the Lender, upon reasonable advance notice, to visit and inspect any of the properties of the Borrower and to examine its books and records and make extracts therefrom and discuss the affairs, finances, and accounts of the Borrower with representatives thereof, during normal business hours, and as often as the Lender may reasonably request.

Section 6.05 Maintenance of Records.  Keep adequate records and books of account, in which complete entries were made in accordance with GAAP, reflecting all financial transactions of the Borrower.

Section 6.06 Maintenance of Properties.  Maintain, keep, and preserve, all of its Collateral and property necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted.

Section 6.07 <u>Maintenance of Deposit Relationship</u>.

    (a)    Borrower shall establish and maintain a separate depository account with Lender for the specific purpose of depositing to proceeds of all Bona Fide Sales Contracts for the duration of the Loan. Such account shall be subject to deduction of automatic monthly loan payments by Lender.

    (b)    Maintain Borrower's primary and active deposit relationship with Lender throughout the term of the Loan.

Section 6.08 <u>Insurance</u>.

    (a)    Keep the Premises, and all insurable property at the Premises, real and personal, now owned or hereafter acquired, insured at all times against loss or damage by fire and risks and other hazards of the kinds customarily insured against and in the amounts satisfactory to Lender and customarily carried by businesses engaged in comparable businesses, in an amount not less than the principal balance of the Loan, all such insurance shall be under valid and enforceable policies issued by insurers of recognized responsibility, acceptable to the Lender; and, promptly from time to time upon request of the Lender, deliver to the Lender a summary schedule indicating all insurance then in effect. Such insurance shall: (i) name the Lender as an insured party thereunder (without any representation or warranty by or obligation upon the Lender) and shall contain a standard lender loss payee clause making losses payable to the Lender as an additional insured, (ii) provide that there shall be no recourse against the Lender for payment of premiums or other amounts with respect thereto, and, (iii) provide that at least thirty (30) days' prior written notice of cancellation of or lapse shall be given to the Lender by the insurer. The Obligors hereby authorize and direct any insurer concerned to pay directly to Lender any proceeds (not in excess of the total amount due Lender hereunder) which may be payable under such insurance, including return of unearned premiums, and Lender may, at its option, apply such proceeds to the replacement of the secured property or to any indebtedness of the Obligors to Lender. In the event of any loss or damage to any secured property, the Obligors shall immediately notify the Lender thereof in writing and the Lender may file a proof of loss under such policy of insurance. All certificates of insurance shall be on a form ACORD 28, or such other form as is acceptable to Lender.

    (b)    Maintain comprehensive general public liability insurance in the minimum amount of One Million and 00/100 ($1,000,000.00) Dollars and workers compensation insurance (in limits as required by state law) in full force and effect, under valid and enforceable policies issued by insurers of recognized responsibility acceptable to the Lender; and, promptly from time to time and upon request of the Lender, deliver to the Lender a summary schedule indicating all insurance then in effect. Such insurance shall: (i) name the Lender as an insured party thereunder (without any representation or warranty by or obligation upon the Lender) as an additional insured, (ii) provide that there shall be no recourse against the Lender for payment of premiums or other amounts with respect thereto, and, (iii) provide that at least thirty (30) days' prior written notice of

cancellation or of lapse shall be given to the Lender by the insurer. All certificates of insurance shall be on a form ACORD 25, or such other form as is acceptable to Lender.

(c)    Maintain, as applicable, and provide the Lender with evidence of a prepaid Fire and Extended Coverage Insurance Policy insuring the buildings, improvements, furnishings, fixtures, inventory, machinery and equipment constituting any part of the Premises against physical damage by fire and other risks generally covered under the broadest available form of extended coverage in an amount satisfactory to Lender, naming Lender as Mortgagee/Lender/Lost Payee and further requiring at least thirty days (30) prior written notice of cancellation or amendment.

(d)    Borrower shall pay as they shall become due all premiums for all insurance required hereunder, and shall deliver evidence of payment to Lender within ten (10) days of payment. In event of loss or casualty, Borrower shall give immediate written notice to Lender, and Lender may make proof of loss if not promptly made by Borrower. Lender shall have the right, at its election, to adjust and compromise any loss claims under such insurance. Borrower directs any insurance company to pay directly to Lender any monies which may become payable to Borrower or Lender as above and under such insurance, including return of unearned premiums, and Borrower appoints Lender as attorney-in-fact to endorse any draft for such monies. All amounts recoverable under any insurance policy required by this Agreement are assigned to Lender and in the event of a loss the amount so collected, in the Lender's sole discretion, shall either be made available for restoration or replacement of the Improvements, or applied by Lender, in such order of priority as Lender shall determine, to the payment of accrued interest and principal, whether or not then due and payable, or any other sums advanced pursuant to this Agreement.

Section 6.09 <u>Flood Insurance</u>. If at any time the Premises, or any portion thereof, is identified as being located in an area designated by an appropriate governmental body as subject to a flood hazard, the Borrower shall obtain flood insurance as provided in the National Flood Insurance Act of 1968, as amended, naming Lender as a loss payee. If Obligors fail to obtain such insurance, it may be obtained by Lender and the cost thereof shall be payable by Obligors. Failure to pay for such insurance shall constitute an Event of Default hereunder.

Section 6.10 <u>Future Condition</u>. Notify the Lender, in writing, within a commercially reasonable period of time but no more than ten (10) days of: (i) the institution of any litigation; (ii) the commencement of any administrative proceedings; or (iii) the happening of any event which would be reasonably likely to materially adversely affect the business operations or financial condition of the Borrower or any other Obligor and the ability of Borrower to comply with the terms and conditions of this Agreement.

Section 6.11 <u>Other Obligations</u>.    Maintain all obligations of Borrower in whatsoever manner incurred, including, but not limited to, obligations for borrowed money or for services or goods purchased by Borrower, in a current status.

Section 6.12 <u>Reimbursement for Certain Expenses</u>.  Pay or reimburse the Lender upon demand and save the Lender harmless against liability for the payment of all reasonable out-of-pocket expenses, including, without limitation, reasonable legal fees and costs, appraisal fees, audit fees, title search fees, environmental audit fees, and any broker fees, incurred by the Lender: (i) arising in connection with the development, preparation, execution, and performance of this Agreement, any other Loan Document, and all related transactions, (ii) relating to any requested amendments, waivers, or consents pursuant to the provisions hereof, (iii) arising out of, or in connection with, any action or proceeding (including any action or proceeding arising in or related to any insolvency, bankruptcy, or reorganization involving or affecting the Borrower or any other Obligor of the Borrower) taken to protect, enforce, determine, or assert any right or remedy under this Agreement or any Loan Document or in any collateral (including but not limited to the Premises) securing any Obligations evidenced by any Loan Document, ("Collateral") or (iv) resulting from, arising out of, or in connection with, the administration of this Loan or the breach of any representation or warranty of the Borrower or any other Obligor made herein or in any other Loan Document.  Except to the extent prohibited by applicable law, the Borrower shall also be obligated to pay all fees and costs incurred or charged for the release or satisfaction of any liens against or upon the Premises and any other collateral, which fees and costs shall be paid immediately upon the satisfaction or release of such liens.  The Lender may also, at its discretion, deliver to the Borrower the documents necessary for satisfaction or release of any lien in favor of Lender against any Collateral, and in such case it shall be the responsibility of the Borrower to record or file such satisfaction or release, as applicable, with the appropriate entity and to pay all costs incurred thereby.

Section 6.13 <u>Additional Appraisals</u>.  That Lender shall have the right to obtain an appraisal of the Premises at Borrower's expense:  (i) after an Event of Default has occurred or is continuing; (ii) where required by federal or state regulation; or (iii) where required by Lender's policy.

Section 6.14 <u>Compliance with Laws</u>.  Comply with, and cause each other Obligor to comply with, all applicable laws (including but not limited to any applicable tax law, product safety law, occupational safety or health law, environmental protection or pollution control law, hazardous waste or toxic substances management, and handling or disposal law) in all respects, provided that the Borrower shall not be deemed to be in violation of this Section as a result of any failures to comply which would not result in fines, penalties, injunctive relief, or other civil or criminal liabilities which, in the aggregate, would materially affect the business, operations, or financial condition of the Borrower or of any Obligor or the ability of the Borrower or of any Obligor to perform its obligations under any Loan Document to which it is a party.

Section 6.15 <u>Consequential Damages</u>.  The Lender shall not be responsible or liable for any damages, consequential or otherwise, that may be incurred or alleged by Borrower or by any other person or entity, including any Obligor, as a result of any of the Loan Documents or the exercise of the terms thereof by Lender or the collection by or on behalf of the sums due thereunder, unless such damages are incurred as a result of the gross negligence or willful misconduct of the Lender.

Section 6.16 <u>Reporting Requirements</u>. Furnish, or cause to be furnished, to the Lender:

(a)    Promptly after the commencement thereof, notice of all actions, suits, and proceedings before any court or governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign, affecting the Borrower which, if determined adversely to the Borrower, could have a material adverse effect on the financial condition, properties, or operations of the Borrower;

(b)    Upon the occurrence of an Event of Default, a written notice setting forth the details of such Event of Default and the action which is proposed to be taken by the Borrower with respect thereto;

(c)    Prompt notification of: (i) the institution of any litigation; (ii) the commencement of any administrative proceedings; or (iii) the happening of any event which, in all cases, would materially adversely affect the business operations or financial condition of the Borrower; and,

(d)    Such other information respecting the condition or operations, financial or otherwise, of the Obligors or any of them as the Lender may from time to time reasonably request.

Section 6.17 <u>Financial Covenant</u>. At all times while any amounts are outstanding under the Loan, Borrower shall maintain a consolidated debt service coverage ratio ("DSCR") of not less than 1.3X (i.e., 1.3:1) measured at fiscal year-end, tested annually commencing with fiscal year ending December 31, 2022. The DSCR shall be calculated based upon the consolidated reviewed financial statements of Real Estate, LLC and Borrower, by dividing the sum of their combined EBITDA less distributions (such sum being the numerator) by the sum of the aggregate of Borrower's current portion of long-term debt, current portion of Capital Lease obligations and interest expense due and payable during the period being measured (such sum being the denominator).

Section 6.18 <u>Capital Adequacy</u>. If, after the date hereof, either: (a) the introduction of, or any change or phasing in or implementation of any Applicable Law or regulation or in the interpretation thereof by any Governmental Authority charged with the administration thereof; or (b) compliance with any directive, guidelines or request issued after the date hereof from any central bank or Governmental Authority (whether or not having the force of Applicable Law); or (c) compliance with the Risk-Based Capital Guidelines of the Federal Reserve System as set forth in 12 C.F.R., Parts 208 and 225, or the Risk-Based Capital Guidelines of the Comptroller of the Currency, Department of the Treasury, as set forth in 12 C.F.R. Part 3, affects, after the date hereof, the amount of capital required or expected to be maintained by Lender, and Lender or any corporation directly or indirectly owning or controlling (including Lender) and Lender shall have determined in good faith that such introduction, change, or compliance has the effect of reducing the rate of return on Lender's capital or the asset value to such Lender of the Loan or any other credit accommodation made by Lender, as a consequence, directly or indirectly, of its obligations to make and maintain the funding of loans or advances

hereunder, to a level below that which such compliance (after taking into account such Lender's policies regarding capital adequacy) by an amount reasonably deemed by it to be material, to the extent such introduction, change, or compliance is attributable to the Loan or any advance thereof then, upon demand by Lender, which demand shall be preceded by at least ninety (90) days prior written notice setting forth Lender's intent to charge additional amounts, together with an estimate of the increased charges and rates, Borrower shall promptly pay to Lender such additional amount or amounts as shall be sufficient to compensate Lender for such reduction on the rate of return. Lender's good faith determination of such amount or amounts that will compensate Lender for such reductions shall be presumed correct absent manifest error and is to be applied to other borrowers generally which are similarly situated under similar circumstances.

Section 6.19 <u>Subordination of Debt</u>. Maintain all current and future obligations of any Obligor to any other Obligor and/or any shareholder, partner or member of any Obligor, and any security interest and/or lien associated therewith, subordinate in all respects to the Obligations of each such Obligor on the Loan. No such Obligor may make any regularly scheduled or any other payments of principal and interest on any such other subordinated loan without the express prior written consent of Lender.

Section 6.20 <u>Further Assurances</u>. The Obligors agree to do such further acts and things and to execute and deliver to the Lender such additional assignments, agreements, powers, and instruments, as the Lender may reasonably require or reasonably deem advisable to carry into effect the purposes of this Agreement or to better assure and confirm unto the Lender its rights, powers and remedies hereunder.

## ARTICLE 7 – NEGATIVE COVENANTS

**<u>Negative Covenants of Obligors</u>**. In addition to the covenants contained in the Loan Documents, Obligors hereby covenant and agree that, so long as any part of the Loan is outstanding, the Obligors shall not, except as Lender may otherwise agree in writing:

Section 7.01 <u>Additional Liens</u>. Create, incur, assume, or suffer the title to the Premises and any other Collateral to be encumbered or subjected to any mortgage, judgment, claim, lien, or demand, or other legal action or obligation, except for any mortgages or other Liens in favor of the Lender, liens in favor of Ford Motor Credit Corp., and such leases and purchase money security interests in excess of $100,000.00 in the aggregate at any one time as shall be approved by Lender, such approval not to be unreasonably withheld or delayed.

Section 7.02 <u>Transfer of Assets</u>. Sell, transfer, or assign any assets, whether now owned or hereafter acquired, except in the ordinary course of business for value received; or, acquire stock or other equity interest of another entity, except in the ordinary course of business.

Section 7.03 <u>Limits on Debt</u>. Create, incur, assume, or suffer to exist any debt except: (i) debt evidenced by the Notes or any other note of any Borrower or any other

Obligor payable to the order of the Lender; (ii) trade accounts payable, rentals payable under leases, and other debt (except for money borrowed) incurred in the ordinary course of business; (iii) debt existing on the date hereof and disclosed in the Borrower's financial statements referred to herein; and (iv) debt secured by Liens in favor of Ford Motor Credit Corp., for purchase money security interests not exceeding $100,000.00, or for which Lender has given its written consent, which consent will not be unreasonably withheld.

Section 7.04 <u>Hazardous Materials; Indemnification</u>.  Use, generate, treat, store, dispose of, or otherwise introduce, any Hazardous Materials or Regulated Substances into or on any real property owned or leased by it (including, but not limited to, the Mortgaged Premises), and will not cause, suffer, allow, or permit anyone else to do so, except in an environmentally safe manner through methods which have been approved by and meet all of the applicable standards of all federal, state, or local agencies with authority to enforce Environmental Laws.

Section 7.06 <u>Restrictions on Transfer</u>.  Without the prior written consent of Lender, sell, transfer, permit, or suffer to be sold or transferred, voluntarily or by operation of law (other than by death or by execution on the Notes), all or any of their respective interests (legal, equitable, or otherwise) in the Collateral, except in the ordinary course of business, and any failure to comply herewith shall constitute an immediate Event of Default hereunder and under the Loan Documents.  No junior or other encumbrance on the Collateral or any other assets of Borrower shall be permitted without the Lender's prior written consent and failure to comply herewith shall constitute an immediate Event of Default hereunder and under the Loan Documents.

## ARTICLE 8 – EVENTS OF DEFAULT

Section 8.01 <u>Events of Default</u>.  The occurrence of any of the following shall constitute an Event of Default hereunder:

(a)    If any representation or warranty made or deemed made by any Obligor in this Agreement or which is contained in any certificate, document, opinion, financial, or other statement furnished at any time in connection with this Agreement, shall prove to have been incorrect, incomplete, or misleading in any material respect on or as of the date made or deemed made;

(b)    The failure of any Obligor to observe or perform any promise, covenant, warranty, obligation, representation or agreement in this Note or in any other Loan Document or in any document evidencing or securing any of the Obligations, other than for the payment of money, which failure is not cured on or before the thirtieth (30th) day after Lender's written notice in accordance with the Loan Agreement; provided, however, that if such default is susceptible to cure but such cure cannot be accomplished with reasonable diligence within such period of time, and if Borrower commences to cure such default promptly and thereafter prosecutes the curing of such default with reasonable diligence, such period of time shall be extended to such period of time (not to exceed an additional sixty (60) days) as may be necessary to cure such default with reasonable diligence; or,

(c)     Any material adverse change in the business, results of operations, assets, or financial condition of any Obligor or any Obligor's ability to perform its obligations under the Loan Documents;

(d)     Subject to any applicable grace or cure period, if any, the failure of any Obligor to observe or perform any material agreement or obligation of any nature whatsoever with Lender;

(e)     The occurrence of any Event of Default in any Loan Document, including the Note.

(f)     The occurrence of any event of default as defined in, or occurring under, any loan document or the default of any other obligation of any Obligor now or hereafter owing to the Lender.

(g)     Another secured party or judgment creditor exercises its rights against the Collateral; and/or,

(h)     The failure to execute and deliver, or invalidity of any document required to be executed and delivered, at Closing pursuant to <u>Section 3.01</u> of this Agreement.

(i)     Notwithstanding the foregoing, Lender shall give Borrower notice of any default other than as provided under Section 8.01(b), and if such default is curable and if Borrower has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured and no Event of Default will have occurred if Borrower after receiving written notice from Lender of such default: (1) cures the default within fifteen (15) days or longer if a longer period of time is provided in this Agreement; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

## ARTICLE 9 – REMEDIES

Section 9.01 <u>Remedies of Lender</u>.  Upon the determination by Lender that there has been the occurrence of an Event of Default, the Lender may, if it so elects, and without any notice or demand to Borrower (or to any other Obligor) whatsoever (which notice or demand is expressly waived, except to the extent otherwise specifically provided herein or in the other Loan Documents), exercise any or all (or none) of the following rights and remedies (all of which rights and remedies shall be cumulative) as the Lender, in its sole discretion, may deem necessary or appropriate:

(a)     Lender may declare all Obligations secured hereby immediately due and payable, and, in its sole discretion, may proceed to enforce payment of same and exercise any of the rights and remedies available to a secured party by law including those available to it under Article 9 of the UCC; and/or

(b)    exercise all such other rights and remedies as are available in the Note, and/or any of the other Loan Documents (including, but not limited to, the right to set off any or all of the Obligations of Borrower against any or all of the property of Borrower or any other Obligor in the possession or control of Lender), or under applicable law, or which it may otherwise have, against the Borrower or any other Obligor or otherwise.

Section 9.02  If Lender requests, Borrower must assemble and make available any Collateral at a place and time designated by Lender.  Unless otherwise required under applicable law, Lender has no obligation to clean or otherwise prepare the Premises for sale or other disposition and Borrower waives any right it may have to require Lender to enforce the security interest or payment or performance of the Obligations against any other person.

Section 9.03  Failure to Exercise Remedies.  Neither failure nor delay on the part of the Lender to exercise any right, remedy, power, or privilege hereunder or under any Loan Document, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder or under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The acceptance by the Lender of any partial payments on the Loan or any other Obligations made by or on behalf of the Borrower after the occurrence of an Event of Default hereunder or under any Loan Document shall not be deemed a waiver or cure by the Lender of said Event of Default unless expressly agreed in writing by the Lender.

## ARTICLE 10 – MISCELLANEOUS

Section 10.01  Modifications.  Modifications, waivers, or amendments of or to the provisions of this Agreement or any other Loan Document shall be effective only if set forth in a written instrument signed by the party against whom same is sought to be enforced.

Section 10.02  Binding Nature.  The rights and privileges of the Lender contained in this Agreement shall inure to the benefit of its successors and assigns, and the duties of the Obligors shall bind all heirs, personal representatives, successors, and assigns. All agreements, representations, warranties, and covenants made by the Obligors herein or in any of the other Loan Documents shall survive the execution and delivery of this Agreement and all other documents referred to herein and shall be continuing as long as any portion of any Obligations owed to the Lender hereunder shall remain outstanding and unpaid.

Section 10.03  Joint and Several Obligation.  If more than one Borrower shall sign this Agreement, then this Agreement shall be the joint and several obligation of each such Borrower and each Borrower shall be deemed to have made the promises, representations, and warranties herein set forth.

{11060326; 4}                    28

Section 10.04 <u>Governing Law</u>. This Agreement and all of the Loan Documents shall in all respects be governed by the laws of the Commonwealth of Pennsylvania and construed as if drafted equally by all parties hereto.

Section 10.05 <u>Time of Performance</u>. Time of performance hereunder is of the essence of this Agreement.

Section 10.06 <u>Severability</u>. If any provision hereof shall for any reason be held invalid or unenforceable, no other provision shall be affected thereby, and this Agreement shall be construed as if the invalid or unenforceable provision had never been a part of it.

Section 10.07 <u>Captions</u>. The descriptive headings hereof are for convenience only and shall not in any way affect the meaning or construction of any provision hereof.

Section 10.08 <u>Computations</u>. Except as otherwise expressly stated herein, all computations required herein shall be made by the application of GAAP.

Section 10.09 <u>Continuing Obligation</u>. If any claim is ever made upon the Lender for the repayment or return of any money or property received by the Lender from any other Obligor in payment of the Loans or any other Obligations, and the Lender repays or returns all or part of said money or property by reason of: (i) any judgment, decree, or order of any court or administrative body having jurisdiction over the Lender or any of its property or (ii) any settlement or compromise of any such claim accomplished by Lender with such claimant, then in such event the Obligors agree that any such judgment, decree, settlement, or compromise shall be binding upon Obligors, notwithstanding any termination hereof or the cancellation of any note or other instrument evidencing any liability to the Lender, and the Obligors shall be, and shall remain liable to, the Lender hereunder for the amount so repaid or the value of the property returned to the same extent as if such had never originally been received by the Lender. The Obligors agree that the Lender shall have no duty or affirmative obligation to defend against such claim and may object to or pay such claim in its sole discretion without impairing or relinquishing the obligations of the Obligors hereunder. This provision shall survive the termination of this Agreement.

Section 10.10 <u>Assignment</u>. This Agreement may not be assigned by the Obligors. This Agreement, or all or any portion of the Obligations evidenced hereby, may be assigned by the Lender, in whole or in part. The Obligors hereby authorize the Lender to disclose (or ratifies any disclosures made by the Lender) any and all information that the Lender may from time to time possess regarding the Obligor, the Loans, the Loan Documents, the Premises, or any other Obligations or any other Collateral to any financial institution and to any accountants, appraisers, or other third parties acting on behalf of such institution, to which the Lender seeks to assign the Loan or any other Obligations or to sell a participation interest in the Loan or any other Obligations. The foregoing is not to be understood as a limitation upon any other right or duty the Lender may have to make any disclosure to anyone.

Section 10.11  <u>Participation</u>.  The Lender shall have the unrestricted right at any time and from time to time, and without the consent of or notice to the Obligors to grant to one or more institutions or other persons (each a "Participant") participating interests in the Lender's obligations to lend hereunder and/or any or all of the loans held by the Lender hereunder. In the event of any such grant by the Lender of a participating interest to a Participant, whether or not upon notice to the Obligors, the Lender shall remain responsible for the performance of its obligations hereunder and the Obligors shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations hereunder.  The Lender may furnish any information concerning the Obligors in its possession from time to time to any prospective assignees and Participants, provided that the Lender shall require any such prospective assignee or Participant to maintain the confidentiality of such information.

Section 10.12  <u>Notices</u>.

(a)     All notices or other communications required or permitted to be made upon any party hereunder shall be in writing and sent by: (i) hand delivery or (ii) national overnight express courier with written verification of actual delivery, or (iii) by first-class, United States mail, postage prepaid, registered or certified with return receipt requested.

**If to Lender:**
Univest Bank and Trust Co.
14 North Main Street
Souderton, PA 18964
Attn:  Michael J. Fox, Executive Vice President

**With a copy to:**
Hill Wallack LLP
777 Township Line Road, Suite 250
Yardley, PA  19067
Attn: Timothy J. Duffy, Esquire

**If to Borrower:**
George D. Manderbach, Inc.
301 S. Front Street
Hamburg, PA 19526
Attn:  Steven Kahlon, President

**With a copy to:**
Masano Bradley, LLP
1100 Berkshire Blvd., Suite 201
Wyomissing, PA 19610
Attn: Michael J. Gombar, Jr. Esq.

Such notice shall be delivered or sent to the address set forth above or at such other address of which either party shall have given the other by notice in writing in accordance with the foregoing.

{11060326; 4}                                    30

(b)      Notice sent by overnight courier or mailed in accordance with the foregoing shall be effective three (3) business days following deposit, or sooner upon receipt. Notice given in any other manner permitted herein shall be effective only if and when received by the addressee.

(c)      Notice given to either party by the attorney for the other party shall constitute notice from such party (and the attorneys for each party are hereby permitted to give such notice to the other party on behalf of their client). Failure to provide copies of any notice to counsel as provided above shall not invalidate or limit the effect of such notice.

Section 10.13    Cumulative Remedies. The rights and remedies provided hereunder are cumulative and not exclusive of any rights or remedies (including without limitation, the right of specific performance) which Lender would otherwise have. Any waiver, consent, or approval of any kind or character on the part of the Lender of any event of default or breach of this Agreement or any Loan document or any such waiver of any provision or condition hereof or thereof must be in writing and shall be effective only to the extent in such writing specifically set forth. Obligors acknowledge that with respect to this Agreement and its terms, Obligors are neither authorized nor entitled to rely on any representations, course of dealing, modifications, or assurances in any form as to any subject from any officer of the Lender unless and until such representations, modifications, course of dealing, or assurances are set forth in writing and signed by such officer of the Lender.

Section 10.14 Third Party Beneficiaries. The parties do not intend the benefits of this Agreement to inure to any third party. Notwithstanding anything contained herein or in the Note or any other Loan Document executed in connection with this transaction, or any conduct or course of conduct by either or both of the parties hereto, or their respective Affiliates, agents, or employees, before or after the signing of this Agreement or any of the other aforesaid Loan Documents, this Agreement shall not be construed as creating any rights, claims, or causes of action against the Lender, or any of its officers, directors, agents, or employees, in favor of any person or entity other than the Obligors.

Section 10.15 Prior Understandings. This Agreement and the Loan Documents supersede all prior understandings and agreements, whether written or oral, between the parties hereto and thereto relating to the transactions provided for herein or therein.

Section 10.16 Indemnification.

(a)      Borrower releases and shall indemnify, defend and hold harmless Lender, and its officers, employees and agents, of and from any claims, demands, liabilities, obligations, judgments, injuries, losses, damages and costs and expenses (including, without limitation, reasonable legal fees) resulting from (i) acts or conduct of Borrower under, pursuant or related to this Agreement and the other Loan Documents, (ii) Borrower's breach or violation of any representation, warranty, covenant or undertaking contained in this Agreement or the other Loan Documents, (iii) Borrower's failure to comply with any requirement of law (including without limitation Environmental

Laws, etc.), and (iv) any claim by any other creditor of Borrower against Lender, and its respective officers, employees and agents arising out of any transaction whether hereunder or in any way related to the Loan Documents and all costs, expenses, fines, penalties or other damages resulting therefrom. Borrower's foregoing obligation shall not apply to claims, demands, liabilities, obligations, judgments, injuries, losses, damages and costs and expenses (including, without limitation, reasonable legal fees) resulting from acts or conduct of Lender, or of any of its respective officers, employees and agents constituting willful misconduct or gross negligence.

(b)     Lender releases and shall indemnify, defend and hold harmless Borrower, and its officers, employees and agents, of and from any claims, demands, liabilities, obligations, judgments, injuries, losses, damages and costs and expenses (including, without limitation, reasonable legal fees) resulting from acts or conduct of Lender, or of any of its respective officers, employees and agents constituting willful misconduct or gross negligence.

(c)     Promptly after receipt by an indemnified party under subsection (a) above of notice of the commencement of any action by a third party, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such subsection, notify the indemnifying party in writing of the commencement thereof. The omission so to notify the indemnifying party shall relieve the indemnifying party from any liability which it may have to any indemnified party under such subsection only if the indemnifying party is unable to defend such actions as a result of such failure to so notify. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified  party (who shall not, except with the consent of the indemnified party, be counsel to the indemnified party), and, after notice from the indemnifying party to such indemnified  party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party under such subsection for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof other than reasonable costs of investigation.

Section 10.17  Relationship of Parties.  It is hereby acknowledged by Lender and Obligors that the relationship between them created hereby and by the other Loan Documents is that of creditor and debtor and is not intended to be and shall not in any way be construed to be that of a partnership, a joint venture, or principal and agent; and it is hereby further acknowledged that by Lender or disbursement of any Loan proceeds to anyone other than Obligors shall not be deemed to make Lender a partner, joint venturer, or principal or agent of Obligors, but rather shall be deemed to be solely for the purpose of protecting Lender's security for the Obligations evidenced by the Note and other Obligations of Borrower to Lender.

Section 10.18  No Implied Waiver.  No delay or failure of the Lender in exercising any right, power, or remedy hereunder shall operate as a waiver thereof; nor shall any

single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power, or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 10.19  Taxes.  The Borrower agrees to pay or cause to be paid any and all stamp, document, transfer, or recording taxes, and similar impositions payable or hereafter determined to be payable in connection with the Loan Documents, and agrees to save the Lender harmless from and against any and all present or future claims or liabilities with respect to, or resulting from, any delay in paying or omission to pay, any such taxes or similar impositions.

Section 10.20  EXCLUSIVE JURISDICTION.  IN ANY LEGAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY LOAN DOCUMENT OR THE RELATIONSHIP EVIDENCED HEREBY THE OBLIGORS HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURT OF COMMON PLEAS OF BERKS COUNTY OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA. THE OBLIGORS EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND THE OBLIGORS HEREBY WAIVE ANY OBJECTION WHICH THE BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, OR FORUM NON CONVENIENS. THE OBLIGORS HEREBY WAIVE PERSONAL SERVICE OF THE SUMMONS, COMPLAINT, AND ANY OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREE THAT SERVICE OF SUCH SUMMONS, COMPLAINT, AND ANY OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO THE OBLIGORS AT THE ADDRESSES SET FORTH ABOVE AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE PROVIDING OF NOTICE IN ACCORDANCE WITH THE TERMS HEREOF.  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO AFFECT THE RIGHTS OF THE LENDER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW, OR TO PRECLUDE THE ENFORCEMENT BY THE LENDER OF ANY CLAIM, OR ANY JUDGMENT OR ORDER OBTAINED IN SUCH FORUM, OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT OR OTHERWISE TO ENFORCE SAME, IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION.

Section 10.21  TRIAL BY JURY.  OBLIGORS EACH HEREBY IRREVOCABLY WAIVE ANY RIGHT OR CLAIM TO A JURY TRIAL IN REGARD TO ANY AND ALL ACTIONS AND PROCEEDINGS INVOLVING LENDER, WHETHER ARISING HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT, AGREEMENT, OR UNDERSTANDING. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO ADVANCE THE LOANS AND TO ACCEPT OR RELY UPON THE LOAN DOCUMENTS.

Section 10.22  USA Patriot Act Notice.  To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify,

and record information that identifies each person who opens an account.  For purposes of this section, account shall be understood to include loan accounts.

**The Obligors acknowledge that they have read and understood all of the provisions of this Agreement, including the waiver of jury trial, and have been advised by counsel as necessary and appropriate.**

*[Remainder of page is intentionally left blank]*

*[Signature page to follow]*

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Loan and Agreement to be executed, under seal, by affixing their respective hands and seals the day and year first above written.

**BORROWER:**

Attest:

**George D. Manderbach, Inc.**
a Pennsylvania corporation

By: _____ (Seal)
Steven Kahlon, President

**GUARANTORS**

Witness:

**GBD Real Estate, LLC**
a Pennsylvania limited liability company

By: _____ (Seal)
Steven Kahlon, Sole Member

Attest:

**GDM Leasing Inc.**
a Pennsylvania corporation

By: _____ (Seal)
Steven Kahlon, President

Witness:

**Kinley Motor Cars LLC**
a Montana limited liability company

By: _____ (Seal)
Steven Kahlon, Manager

[*Signatures continue on following page*]

{11060326; 4}                    35

Witness:

**Teton Group LLC**
a Pennsylvania limited liability company

_____

By: _____(Seal)
        Steven Kahlon, Sole Member

Witness:

**LENDER:**
UNIVEST BANK AND TRUST CO.

_____

By: _____(Seal)
        Michael J. Fox, Executive VP

*[Continued signature page of Loan and Security Agreement as to $2,500,000.00*
*Note of George D. Manderbach, Inc., to Univest Bank and Trust Co.]*




2024121928457O



**COMMONWEALTH OF PENNSYLVANIA**
*Department of State*
*Bureau of Corporations and Charitable Organizations*
PO Box 8721
Harrisburg, Pennsylvania 17105-8721
**UCC1 FINANCING STATEMENT**
Fee: $84

**Pennsylvania Department of State**

**-FILED-**

File #: 20241219284570
Date Filed: 12/19/2024

| Submitter contact information | |
|---|---|
| Contact Name | Timothy J Duffy, Esquire |
| Phone Number | (215) 579-7700 |
| Email Address | tduffy@hillwallack.com |

| Submitter information | |
|---|---|
| Name | Hill Wallack LLP |
| Address | 1000 FLORAL VALE BLVD. SUITE 300 YARDLEY, PA 19067 |

Debtors

| DEBTOR'S NAME | MAILING ADDRESS |
|---|---|
| George D. Manderbach, Inc. | P.O. BOX 266 HAMBURG, PA 19526 |
| Whitmoyer Chevrolet, Inc. | 1001 EAST MAIN STREET, ROUTE 2 MT. JOY, PA 17552 |
| Kinley Automotive Group, Inc. | 301 SOUTH FRONT STREET HAMBURG, PA 19526 |

Secured Parties

| SECURED PARTY'S NAME | MAILING ADDRESS | Assignor |
|---|---|---|
| Univest Bank and Trust Co. | 1980 SOUTH EASTON ROAD SUITE 150 DOYLESTOWN, PA 18901 | ☐ |

Collateral
Collateral uploaded in an attachment.

Designations

| | |
|---|---|
| Select the designation which describes this financing statement | Not Applicable |
| Select an additional designation which describes this financing statement | Not Applicable |

Alternative Designations

| | |
|---|---|
| Select the alternative designation which describes this financing statement | Not Applicable |

Optional Submitter Reference Data

B0765-4842  12/19/2024  2:25 PM Received by Pennsylvania Department of State

B0765-4843  12/19/2024  2:25 PM Received by Pennsylvania Department of State

## Schedule "A"

The Debtor hereby grants to the Secured Party a security interest in and first lien priority position in and to the property hereinafter described, whether now owned or hereafter acquired or arising and wherever located (the "Collateral"):

All tangible and intangible personal property of the Debtor, including but not limited to:

      (a)     All Accounts;

      (b)     Chattel Paper, including without limitation, Tangible Chattel Paper and Electronic Chattel Paper;

      (c)     Deposit Accounts;

      (d)     Documents;

      (e)     General Intangibles, including without limitation, Payment Intangible and Software;

      (f)     Goods, wherever located, including without limitation, Equipment (including machinery, motor vehicles, furniture and fixtures), Fixtures and Accessions and Inventory, whether held for sale or lease or to be furnished under contracts of service (including raw material, work in process and materials used or consumed in the conduct of the Debtor's business);

      (g)     Instruments, including Promissory Notes;

      (h)     Investment Property, securities and all subscription rights incident to such securities;

      (i)     Letter-of-credit rights;

      (j)     Motor vehicles;

      (k)     Supporting Obligations;

      (l)     All monies which at any time the Secured Party shall have or have the right to have in its possession;

      (m)     All books and records evidencing or relating to the foregoing, including, without limitation, files, records, ledger sheets, documents and billing records of every kind and description, customer lists, data storage and processing media, Software and related material, including computer programs, computer tapes, cards, disks and printouts, and including any of the foregoing which are in the possession of any affiliate or any computer service bureau;

      (n)     All Commercial Tort Claims; and,

B0765-4844 12/19/2024 2:25 PM Received by Pennsylvania Department of State

          (o)        Proceeds of the above Collateral.

        If the Debtor shall at any time, acquire any Commercial Tort Claim(s), the Debtor shall immediately notify the Secured Party in a writing signed by the Debtor of the brief details thereof and grant to the Secured Party in such writing a security interest therein and in the Proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party.

        Further, in addition to the above, the Debtor a) grants to the Secured Party a security interest in all accessions, parts, accessories, attachments and appurtenances in any way used with, attached or related to, or installed in, or intended to be so used, attached, related to or installed in any equipment or inventory constituting Collateral hereunder; b) grants to the Secured Party a security interest in all substitutions for, renewals of, improvements, replacements and additions to, and the products and proceeds (cash and non-cash) of all of the foregoing property and any insurance policies relating thereto; and c) assigns to Bank all moneys which may become payable on any policy of insurance maintained or required to be maintained under this Agreement, including returned or unearned premiums.

# EXHIBIT B

## Intercreditor Agreement



# Intercreditor Agreement

This Intercreditor Agreement ("Agreement"), dated as of November 20, 2024 is executed by and among AmeriCredit Financial Services, Inc. dba GM Financial ("GM Financial"), with an address at 220 E. Las Colinas Blvd., Irving, TX 75039, Attn: Commercial Lending Services, and UNIVEST BANK AND TRUST CO. ("Creditor"), with an address at 14 N. Main Street, Souderton, PA 18964. GM Financial and Creditor may be hereinafter referred to singularly as "Party" and jointly as "Parties".

### Recitals

WHEREAS, GM Financial provides or may provide credit, loans and other financing accommodations to Whitmoyer Chevrolet, Inc. ("Dealer"), pursuant to which Dealer has granted or may grant GM Financial a security interest in some or all of Dealer's personal property;

WHEREAS, Creditor provides or may provide credit, loans and other financing accommodations to Dealer, and Dealer has granted or may grant Creditor a security interest in some or all of Dealer's personal property; and

WHEREAS, the Parties desire to agree upon the priority of their respective security interests in Dealer's personal property as between themselves.

### Agreement

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth, the sufficiency of which is acknowledged, the Parties agree as follows:

1.  <u>Creditor Collateral.</u>  Creditor will have a first, prior, and superior security interest in, and GM Financial subordinates to Creditor any interest GM Financial may have in, Dealer's presently-owned or hereafter-acquired personal property consisting of the following (collectively, "Creditor Collateral"):

    a)  All vehicle receivables that have been identified as extended payment privilege vehicles between Dealer and GM Financial and are financed by Creditor and for which GM Financial has been paid in full for the foregoing vehicles;

    b)  All Proceeds of the foregoing.

2.  <u>GM Financial Collateral</u>.  GM Financial will have a first, prior, and superior security interest in, and Creditor subordinates to GM Financial any interest Creditor may have in, all of Dealer's presently-owned or hereafter-acquired personal property other than the Creditor Collateral.

3.  <u>Definitions</u>.  All capitalized terms not defined herein shall have the same definition as set forth in the Uniform Commercial Code in effect in the state of Dealer's principal place of business, as amended and replaced from time to time (the "Code"), and such definitions shall change, expand and contract as the definitions and descriptions of those terms as set forth in the Code change, expand or contract.

4.  <u>Matters Excluded</u>.  Regardless of any provision in this Agreement to the contrary, this Agreement does not govern or affect the rights of either Party:

a) as a purchaser of Chattel Paper who gives new value and takes possession of (or, in the case of Electronic Chattel Paper, takes control of) the Chattel Paper in the ordinary course of business; or

b) with respect to Deposit Accounts, Letter-of-Credit Rights, and money, except to the extent that such personal property constitutes identifiable and traceable Proceeds of any personal property in which the rights of the Parties are governed by this Agreement.

Matters not dealt with herein will be governed by the Code and/or other law as may be applicable.

5.  <u>Priority of Rights in Dealer's Property.</u>  The respective priorities, rights and interests of the Parties in Dealer's personal property pertaining to the subject matter herein are governed by the provisions of this Agreement regardless of the time, order, manner, or nature of attachment or perfection of security interests in Dealer's personal property (including the giving or failure to give any purchase money security interest or other notice, or the time or order of filing financing statements) or any provision of the federal Bankruptcy Code, or other applicable law.

6.  <u>Effect of Bankruptcy</u>.  Unless otherwise terminated as provided in paragraph 15 below, this Agreement shall continue in full force and effect after the filing of any petition by or against Dealer under the federal Bankruptcy Code and all converted or succeeding cases in respect thereof.  In such instance, the term "Dealer", as used in this Agreement, includes Dealer as debtor-in-possession and to a trustee for Dealer.

7.  <u>No Other Beneficiaries or Limitation.</u>  This Agreement is solely for the benefits of the Parties and their respective successors and assigns. Neither Dealer nor any other third parties are intended to be benefited, in any way whatsoever, by this Agreement.  This Agreement does not create, perfect, assign, or transfer any security interest in any of Dealer's personal property.  Absent a written amendment to this Agreement, the priorities set forth in this Agreement remain in full force and effect regardless of whether either Party in the future seeks to rescind, amend, terminate, or reform, by litigation or otherwise, its respective agreements with Dealer.

8.  <u>Condition Precedent</u>. The priorities specified in paragraphs 1, 2 and 5 are expressly conditioned upon the non-avoidability and perfection of the security interest to which another security interest is subordinated hereby. If the security interest to which another security interest is subordinated is not perfected (including properly continued, amended, or assigned) or is avoidable for any reason, then, subject to paragraph 9 below, the priorities specified in paragraphs 1, 2 and 5 shall not be effective as to the subject personal property.

9.  <u>Non-Opposition</u>. So long as a Party can reasonably establish a good faith attempt to obtain and preserve a perfected security interest in any item of Dealer's personal property, the other Party to this Agreement shall not directly or indirectly contest the perfection, validity, or enforceability of the security interest of that Party in such personal property.

10. <u>Cooperation</u>.  The Parties will cooperate with one another to share essential information for the purpose of effectuating audits and inspection of their respective collateral.  The Parties will, to the extent circumstances warrant, use their reasonable efforts to provide advance notice to each other prior to or concurrent with commencing any judicial or non-judicial action to enforce its security interest in Dealer's personal property; provided that the failure to do so does not limit or affect the validity of such action or give rise to any claim or defense regarding such notice.

11. <u>Exclusive Agreement</u>.  This Agreement evidences the entire agreement between the Parties. Oral agreement, course of dealing, or usage of trade does not alter, amend, or supersede this Agreement, or operate to permit or cause an amendment of this Agreement.  Waiver of any right or interest does not arise by the delay or failure of either Party to exercise it.  Any alteration, amendment, or displacement of this Agreement will be void and of no effect unless in writing, signed by both Parties and dated after the date of this Agreement.  This Agreement supersedes and

replaces any other similar intercreditor or collateral subordination agreement pertaining principally to personal property of Dealer and previously executed between the Parties. All rights, interests, and duties not governed by this Agreement will be determined under the Code or other applicable law.

12.  <u>Modification of Certain Enforcement Rights</u>.  In the event either Party enforces its respective security interest in Dealer's personal property then as between them, the Party having by reason of this Agreement the junior, subordinate, and inferior interest in an item of Dealer's personal property:

a)  Will not assert any claim for marshalling.

b)  Consents to the disposition of such item of Dealer's personal property free of the subordinate interest, provided the Proceeds are applied in conformity with the Code.

c)  Without the necessity of demand, will turn over to the other Party the Proceeds of such item of Dealer's personal property.

13.  <u>Notice of Sale</u>.  Unless Dealer and any other legally cognizable debtor has waived it as to themselves, the Parties agree to give to each other written notice of any public or private sale or other disposition or retention of Dealer's personal property in which both Parties have any perfected security interest. This paragraph 13 shall constitute the request for notice and a written notice of claim by each Party to the other in accordance with the provisions of the Code.

14.  <u>Notices</u>.  All notices under this Agreement, unless otherwise provided above, must be in writing and will be properly given if sent by U.S. first class mail postage prepaid or reputable overnight delivery, addressed to the Party for whom it is intended at its address set forth above. Each Party may designate a change of address by written notice to the other.

15.  <u>Termination</u>.  This Agreement continues in full force and effect and is irrevocable by either Party until the earlier to occur of the following:

a)  The Parties mutually agree in writing to terminate this Agreement; or

b)  All of the obligations owed by Dealer to either of the Parties are fully paid and satisfied and the respective security interests have been terminated and released of record.

16.  <u>Prior Agreements</u>.  This Agreement supersedes and replaces in their entirety any and all prior agreements between the parties hereto concerning the subject matter herein.

17.  <u>Applicable Law</u>.  This Agreement will be governed and construed in all respects by the law of the state where Dealer's principal place of business is located.

18.  <u>Construction</u>.  The provisions of this Agreement and any ambiguities therein shall be interpreted in a reasonable manner to effect the purpose and intent of this Agreement and shall be construed without presumption for or against the Party who drafted all or any portion of this Agreement.

19.  <u>Paragraph Titles</u>.  The paragraph titles contained in this Agreement are for convenience only and are without substantive meaning or content of any kind and must not be considered part of this Agreement.

20.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date first above written.

AMERICREDIT FINANCIAL SERVICES, INC.

By: _____

Name: Howie Ravitz

Title:  Assistant Vice President
        Commercial Lending Services

UNIVEST BANK AND TRUST CO.

By: _____

Name: Matthew J. Kelly

Title:  Senior Vice President


## ACKNOWLEDGMENT AND CONSENT OF DEALER.

The undersigned Dealer hereby acknowledges and agrees to the foregoing Intercreditor Agreement. Dealer agrees to be bound by the terms and provisions thereof as they relate to the relative rights of the Parties with respect to each other. However, nothing therein shall be deemed to amend, modify, supersede or otherwise alter the terms of the respective agreements between Dealer and each Party (the "Loan Agreements"), and in the event of any inconsistency or conflict between the terms of the Loan Agreements and the Intercreditor Agreement, the Loan Agreements shall govern as between Dealer and each Party. The Dealer agrees that each Party holding Dealer's personal property may serve as bailee for the other Party and each Party is hereby authorized to turn such personal property over to such other Party as provided for in the Intercreditor Agreement. Dealer further agrees that the Intercreditor Agreement is solely for the benefit of the Parties and shall not give Dealer, its successors and assigns, or any other person, any rights vis-a-vis either Party.

Whitmoyer Chevrolet, Inc.

By: _____

Name: Steven B. Kahlon

Title:   President

**EXHIBIT C**

**Notice of Disposition**



*VIA FEDERAL EXPRESS*

May 7, 2025

**TO:**       Univest Bank and Trust Co.
             14 N. Main Street
             Souderton, PA 18964
                 and
             Univest Bank and Trust Co.
             1980 South Easton Road, Suite 150
             Doylestown PA 18901

**FROM:**     AmeriCredit Financial Services, Inc., doing business as GM Financial
             Commercial Lending Services
             220 East Las Colinas Blvd, Suite 500
             Irving, TX 75039

**DEBTOR:**   **Whitmoyer Chevrolet, Inc.**

### NOTICE OF DISPOSITION OF COLLATERAL

To Whom It May Concern:

1.    AmeriCredit Financial Services, Inc., doing business as GM Financial ("GM Financial") as secured party, will sell some or all of Debtor's new and used motor vehicle inventory by private sale sometime after 10 days from the date of this notice.  The vehicles that will be sold include all motor vehicle inventory that GM Financial repossessed from the Debtor. For a list of such vehicles, you may contact the undersigned.

2.    You are entitled to an accounting of the unpaid indebtedness secured by the collateral that we intend to sell for a charge of $50.00 and may request an accounting by calling us at 214-210-1886.

3.    If you have any questions related to this notice or need additional information, please contact Howie Ravitz via e-mail at howie.ravitz@gmfinancial.com.

             AmeriCredit Financial Services, Inc., doing business as GM Financial
                 By:  */s/ Howie Ravitz*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AMERICREDIT FINANCIAL SERVICES, INC. d/b/a GM FINANCIAL, | : |
| Plaintiff, | : No. 5:25-CV-01945 (JMG) |
| v. | : |
| WHITMOYER CHEVROLET, INC., STEVEN BA. KAHLON, and KINLEY CO. VENTURES, INC. | : |
| Defendants. | : |

**CERTIFICATE OF SERVICE**

       I, Julie M. Murphy, do hereby certify that on the date hereof, I caused a copy of the

foregoing **Motion to Intervene, supporting Memorandum and Affidavit of Peter Scirrotto**, to

be served via first-class or electronic mail upon the following:

Michael S. Zullo
Robert J. Brener
Duane Morris LLP
30 S. 17th Street
Philadelphia, PA 19103
MsZullo@duanemorris.com
RJBrenner@duanemorris.com

Paul A. R. Stewart, Esq.
Helm Legal Services LLC
333 East Lancaster Avenue, Ste 140
Wynnewood, PA 19096
pstewart@helmlegalservices.com

May 12, 2025

       /s/ Julie M. Murphy
       Julie M. Murphy Esquire
       STRADLEY RONON STEVENS & YOUNG LLP
       2005 Market Street, Suite 2600
       Philadelphia, PA 19103
       Telephone:  (856) 321-2409
       Facsimile:  (215)564-8120
       Email:  jmmurphy@stradley.com
       *Counsel for Univest Bank and Trust Co.*


       */s/ Matts Batryn*
       Matts Batryn, Esq.